14-1384In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1384

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BOOKER T. SEWELL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:11-CR-35 — **Theresa L. Springmann**, *Judge.*

ARGUED SEPTEMBER 26, 2014 — DECIDED MARCH 13, 2015

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Following a thirteen-month inves-
tigation of a drug-trafficking network that stretched from
Mexico to California to Indiana, the United States secured a
warrant to search seven homes in Fort Wayne, Indiana. Ap-
pellant Booker T. Sewell stayed in one of those homes, locat-
ed at Sawmill Woods Court.

When a team of federal and local authorities arrived there, they soon discovered, among other items, 110 grams of marijuana, cutting agents for cocaine, a drug ledger, multiple scales, $19,900 in cash in the dishwasher, and a loaded revolver. The presentation of this evidence led to Sewell's convictions and sentence, which he now appeals.

Sewell raises four issues. He first argues that the search warrant was issued without probable cause. He next challenges the sufficiency of the evidence to sustain his conviction for being a felon in possession of a firearm. His remaining two challenges concern sentence enhancements applied by the district court.

For the reasons expressed below, we affirm the judgment of the district court on each of the four issues raised by Sewell. In light of our recent decisions in *United States v. Thompson*, Nos. 14-1316, 14-1521, 14-1676, 14-1772, 2015 U.S. App. LEXIS 604 (7th Cir. Jan. 13, 2015), and *United States v. Siegel*, 753 F.3d 705 (7th Cir. 2014), however, we vacate Sewell's conditions of supervised release and remand for resentencing.

## I.  BACKGROUND

The seeds for this case were first sown in 2010. That year, the FBI Safe Streets Task Force in Fort Wayne, Indiana, commenced an investigation into cocaine trafficking that began with controlled buys of powder and crack cocaine. The

investigation ended more than a year later with the arrests of Booker T. Sewell and Silvestre Castaneda,[1] among others.

Sewell, of course, is the appellant in this case. Along with his brothers, Jermorris T. Sewell and Antonio Sewell, Booker Sewell purchased and then sold cocaine and marijuana. Castaneda, on the other hand, served as the major supplier from California. He coordinated the movement of the drugs, largely through commercial shipping companies (by way of sealed soup cans) from California to Indiana. Like Sewell, Castaneda made his business a family affair: Maritza Castaneda, his sister, and Pedro Castaneda Jr., his brother, helped transport the drugs across the country.

On January 27, 2011, the FBI intensified its investigation by implementing court-authorized wiretaps on Castaneda's telephones. Castaneda, like others in the drug trade, used multiple telephones to evade police detection. The FBI's multiple taps thwarted this strategy, recording numerous conversations between Castaneda, Sewell, and their cohorts.

But Castaneda and Sewell utilized a long-attempted "safeguard": they spoke in code. For example, Sewell asked Castaneda on one telephone call, "You got *the one*?" Castaneda replied, "I don't know, do you have … *the three* man?" In another instance, Castaneda told Sewell that he would "call … for sure when I have *the stuff*." On another occasion, Castaneda told Sewell that he would soon return from a trip to California. Sewell assured him, "OK, I'll be

---

[1] Although court transcripts spell his name "Sylvester" Castaneda, both the government and Appellant spell his name "Silvestre." We adopt the latter spelling.

ready." And Castaneda replied, "I am going to bring *some* OK?" On yet another occasion, the two delayed their meeting together and waited for the sky to "get[] a little, get kinda dark."

Real-world events furnished these coded conversations with some context. Two days after Castaneda told Sewell that he was "going to bring *some*," for example, the Fort Wayne Police Department intercepted three kilograms of cocaine shipped in sealed soup cans from California. In 2010, authorities at a bus station seized $178,530 in cash found in sealed soup cans located in the bag of Castaneda's sister.

Then, on March 12, 2011, authorities observed Castaneda travelling to Sawmill Woods Court, where Sewell's wife, Martine, leased a condo. Authorities believed Sewell stayed at Sawmill Woods Court with his wife, and that he conducted much of his drug business there. Authorities were not certain, however, as the lease listed Sewell's wife as the home's only occupant. Adding to the uncertainty was the fact that, at some point, Martine had secured a protective order against her husband.

Sewell hangs his hat on this uncertainty, arguing that the police could not tie him, or any drug activity, for that matter, to Sawmill Woods Court. He also argues that the recorded conversations revealed nothing more than "neutral words," words that in his view failed to establish probable cause. We address these arguments in detail below. Before we do, some additional background is necessary.

*A. The Warrant Application*

On March 31, 2011, FBI Special Agent ("Agent") James Keszei filed a warrant application to search seven homes,

including Sewell's suspected home at Sawmill Woods Court. In his accompanying affidavit, Agent Keszei expressly relied on his fifteen years in law enforcement (including six years as a police officer for South Bend, Indiana, and time spent working narcotics and gangs). Specifically, he offered opinions and inferences in his application that, although grounded in the investigation, were informed by his training and experience. All told, Agent Keszei's affidavit spanned sixty-five pages.

The magistrate judge wasted no time. He granted the application and issued the warrant that same day—March 31, 2011.

*B. Execution of the Warrant & Subsequent Indictment*

Members of the Fort Wayne Police Department, coupled with FBI special agents, executed the warrant on April 13, 2011. When they arrived at the Sawmill Woods Court home, they encountered Sewell downstairs. They read him his rights and gave him a copy of the warrant. Sewell immediately offered damning information: he told the authorities that he kept marijuana in the house along with a significant sum of cash in the dishwasher. Sure enough, the officers found 110.9 grams of marijuana under the kitchen sink and $19,900 in a safe kept in the dishwasher. Another $2,017 was found in a pair of jeans located in the living room.

Sewell further admitted that he kept a gun underneath the bed in the upstairs bedroom. He claimed that his wife did not know anything about the gun, and that it was there for self-defense. "If it wasn't you all running up in here," he offered, "I would be using my gun for my protection, you know what I mean." Sure enough, the officers found a load-

ed revolver underneath the bed. When the authorities re-
trieved it, Sewell's wife disclaimed any knowledge of its
presence in the home.

Authorities found other inculpatory evidence. They
discovered, for example, a ledger with notes that detailed at
least one cutting agent for cocaine—"lidocaine." The words
"cut coke" were conspicuously jotted next to that note. In a
cabinet above the refrigerator, authorities found plastic
wrapping with cocaine residue, a scale (a second one was
found on the refrigerator itself), and a bottle containing 88.9
grams of lidocaine, the cutting agent listed in the ledger.
Under the kitchen sink, another cutting agent—inositol—
was found. Authorities also discovered telephones that were
determined to be the phones from which Sewell called
Castaneda.

Later that month, a federal grand jury returned a two-
count indictment against Sewell: (1) being a felon in posses-
sion of a firearm; and (2) maintaining a place for the purpose
of distributing controlled substances (marijuana and co-
caine). *See* 18 U.S.C. §§ 922(g)(1), 924(e) *and* 21 U.S.C.
§ 856(a)(1), respectively.

*C. Trial and Sentencing*

Sewell pled not guilty to both counts, and his trial lasted
four days. During its case-in-chief, the government called
Castaneda as a witness. Castaneda was also arrested in April
of 2011, and he testified against Sewell with the expectation
that he might obtain some sentencing relief for his coopera-
tion. Castaneda testified that he first met Sewell in 2007 or
2008, and that, over the years, they met more than fifty times
to exchange drugs and money. According to Castaneda, sev-

eral of those meetings occurred at Sawmill Woods Court. Finally, Castaneda confirmed that he spoke in coded language when he talked to Sewell on the telephone.

Sewell's wife, Martine, also testified at trial. Unlike Castaneda, however, she testified in Sewell's defense. Specifically, she claimed that her father gave her the revolver that the police retrieved from underneath the bed. For whatever reason, though, she could not recall its caliber or strength of recoil. It was a .38.

The jury returned a verdict finding Sewell guilty on both counts.

Approximately six months later, the district court held an evidentiary hearing to address sentencing matters. Detective Adalberto Martinez of the Indiana State Police testified at that hearing. He had participated in a pre-trial interview of Castaneda, wherein Castaneda described his many dealings with Sewell. The government probed this topic during the evidentiary hearing.

> Q. Okay. Did Mr. Castaneda say like overall how much cocaine he had supplied to Booker Sewell over their [*sic*] course of their relationship?

> A. Mr. Sylvester [*sic*] Castaneda approximated 30 to 40 kilograms from 2008 to 2011.

> Q. Okay. What was the price range that Castaneda was charging Booker Sewell for kilos of cocaine?

> A. Approximately 2008 when it started, it was about $25,000 and it ranged up to $30,500 in 2011.

Four months after that hearing, the district court sentenced Sewell to concurrent terms of 360 and 240 months of

imprisonment. That total resulted, in part, from two sentence enhancements: (1) possession of a firearm in connection with drug dealing and (2) criminal activity involving not less than fifteen kilograms but not more than fifty kilograms of cocaine. U.S.S.G. §§ 4B1.4(b)(3)(A), 2D1.1(c)(3). The district court also ordered Sewell to serve three years of supervised release (accompanied by a number of mandatory, standard, and special conditions), pay a $200 special assessment, and forfeit the $21,917 recovered during the search of Sawmill Woods Court.

With this background in mind, we turn to the merits.

## II.  ANALYSIS

### A.  Probable-Cause Determination

Sewell argues that the warrant to search Sawmill Woods Court was issued without probable cause. His argument boils down to an attack on Agent Keszei's affidavit, the sole evidence upon which the magistrate judge based his probable-cause determination. Specifically, Sewell argues that the affidavit was deficient because it failed to show that he was involved in any criminal activity. And even if it did, then the affidavit failed to establish a connection between that criminal activity and Sawmill Woods Court. We disagree.

To begin, we afford great deference to the decision of the magistrate judge who issued the warrant. *United States v. Alijabari*, 626 F.3d 940, 944 (7th Cir. 2010). Although we review the sufficiency of the officer's affidavit *de novo* (insofar as it presents questions of law under the Fourth Amendment), *Alijabari*, 626 F.3d at 944, we remain mindful that the magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth

in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted).

Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *Ornelas v. United States*, 517 U.S. 690, 696 (1996). A "fluid concept," its determination rests on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Carroll*, 750 F.3d 700, 703 (7th Cir. 2014) (citations omitted). As a result, we will not disturb a finding of probable cause so long as the issuing judge had a substantial basis for concluding that the proposed search would uncover evidence of wrongdoing. *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010) (citations omitted).

Our independent review of Agent Keszei's affidavit convinces us that the magistrate judge had a substantial basis for his probable-cause finding. Three primary factors produce this result: (1) the recorded conversations; (2) the corroborating evidence; and (3) the reasonable inferences drawn therefrom. These factors weave together a stout fabric of probable cause, rightly resulting in the magistrate judge's issuance of the warrant.

We start with the recorded conversations. Sewell argues that they contain nothing more than "neutral words." (Appellant's Br. 16.) But neutral words, used in the right context, can harbor sinister meaning. *Cf. United States v. Harris*, 271 F.3d 690, 702 (7th Cir. 2001) ("It is well known that drug

dealers commonly use code language out of fear that their conversations will be intercepted."). Here, the frequency and timing of the so-called "neutral words," juxtaposed against real-time events (recall the drug busts and cash seizures), produced a reasonable inference that something criminal was afoot.

Agent Keszei's experience in law enforcement and narcotics, moreover, added much weight to the affidavit. He offered opinions and inferences upon which the magistrate judge was entitled to rely. *See United States v. Elst*, 579 F.3d 740, 746 (7th Cir. 2009) ("Experienced law enforcement officers (as well as experienced magistrates) are permitted to draw reasonable inferences from the facts based on their training and experience."). He deciphered that "stuff" meant "drugs," and "the one" meant "one kilogram" of cocaine. Castaneda confirmed the latter translation during trial.

Adding an element of common sense, Agent Keszei also noted that Sewell's desire to wait to meet Castaneda until it "gets a little … dark" was a deliberate effort to avoid surveillance or detection. When viewed in a vacuum, scheduling a nighttime meeting may not mean anything at all. But in reviewing a probable cause determination, our scope has never been so limited. We employ a totality-of-the-circumstances approach that reviews all the evidence, taken together, in the context of the case at hand. *See United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014) (citing *Gates*, 462 U.S. at 238). The nighttime meeting, therefore, cannot be divorced from the repeated use of coded language, spanning a large period of time, and spoken over numerous telephones. These facts, given the totality of the circumstances, evince a

guilty mind's effort to escape police detection—an effort that lends further support to the finding of probable cause.

Other evidence supports our independent finding of probable cause. In his sixty-five page affidavit, Agent Keszei also recounted the numerous calls and texts exchanged between Castaneda and Sewell *and other associates*—persons all associated with the drug trade and positively identified through voice recognition techniques and subscriber information. Agent Keszei recounted the drug and cash seizures throughout the course of the investigation, seizures precipitated by (and consistent with) these recorded conversations. And he connected Sewell as Castaneda's associate based on their in-person meetings and their uncanny ability to maintain a steady line of communication, despite swapping out numerous telephones. Even if we discount the drug and cash seizures as mere coincidences, at some point the "succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one." *United States v. Bernard*, 623 F.2d 551, 560 (9th Cir. 1979) (citations omitted).

Sewell's backup argument that the affidavit failed to connect him to Sawmill Woods Court fares no better. "Warrants may be issued even in the absence of direct evidence linking criminal objects to a particular site." *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009). Additionally, "courts are 'entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense, and specifically, *in the case of drug dealers, evidence is likely to be found where the dealers live*.'" *United States v. Kelly*, 772 F.3d 1072, 1080 (7th Cir. 2014)

(quoting *Orozco*, 576 F.3d at 749) (emphasis added). Here, it was entirely reasonable to infer that Sewell lived with his wife, even if only her name appeared on the lease. Many married couples live together, after all. And if he lived with his wife, then it was also entirely reasonable to believe that he operated his drug business from the home, as other drug dealers do. *See Kelly*, 772 F.3d at 1080; *see also United States v. Anderson*, 618 F.3d 873, 881 (8th Cir. 2010) ("Drug dealers commonly put their property in someone else's name to avoid detection.") (citation omitted).

But if more is needed, Sewell had been seen at Sawmill Woods Court on at least three occasions, including one occasion after his wife secured the protective order against him. So even if the two had a falling out, it was reasonable to infer that by that point the two had reconciled—a fact that increases the odds that Sewell could be found there. Critically, the identified drug supplier, Castaneda, had also been seen at Sawmill Woods Court.

For all these reasons, Sewell's arguments regarding probable cause are unavailing. Agent Keszei's comprehensive affidavit established probable cause, and the magistrate judge made the correct call in issuing the warrant. We will not disturb it on appeal.

B. *Sufficiency of the Evidence*

Sewell next challenges the sufficiency of the evidence to sustain his conviction for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). His hurdle on this issue is a high one. *See United States v. Bey*, 725 F.3d 643, 649 (7th Cir. 2013) (describing our deferential review to challenges based on the sufficiency of the evidence). We overturn a

conviction for insufficiency of the evidence only when, viewed in the light most favorable to the government, "the record is devoid of evidence" from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *United States v. Campbell*, 770 F.3d 556, 568 (7th Cir. 2014). Under this standard, we neither weigh evidence nor assess the credibility of witnesses; that task is for the trier of fact. *United States v. Griffin*, 150 F.3d 778, 784–85 (7th Cir. 1998).

We start our analysis with the statute that details the crime. 18 U.S.C. § 922(g)(1) criminalizes a felon's possession of any firearm affecting interstate commerce. Accordingly, the statute requires proof of three elements: (1) a prior felony conviction; (2) possession of the firearm; and (3) the firearm's movement in interstate commerce. *United States v. Ortiz*, 474 F.3d 976, 982 (7th Cir. 2007). Notably, possession may be either constructive or actual. *United States v. Villasenor*, 664 F.3d 673, 681 (7th Cir. 2011).

Here, Sewell contests only possession. In support, he argues that no one testified to having seen him with the revolver. And he advances the testimony of his wife who claimed that the revolver belonged to her. Evidently then, Sewell would have us re-weigh the evidence and make credibility determinations. But we cannot employ that wide scope of review at this stage of his case. *Griffin*, 150 F.3d at 784–85.

The authorities found a loaded revolver underneath Sewell's bed. That fact is sufficient to affirm a finding of constructive possession, which "exists when a person knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly, or through others." *United States v. Caldwell*, 423 F.3d 754, 758

(7th Cir. 2005) (citations omitted); *see also Campbell*, 770 F.3d at 568 (requiring reversal only where the record is "devoid of evidence"). We emphasize that Sewell told the authorities exactly where to find the revolver. And based on his statement to Officer Angela Reed of the Fort Wayne Police Department, he had both the power and the intention to use it. "If it wasn't you all running up in here," Sewell said, "I would be using my gun for my protection, you know what I mean."

The jury credited Officer Reed's testimony detailing this admission. Conversely, it discredited Sewell's wife's testimony, likely based on her inability to recall simple details about the revolver such as its caliber and strength of recoil. Sewell may quibble with these credibility findings, but once again, we may not. *United States v. Green*, 648 F.3d 569, 578 (7th Cir. 2011) ("We do not weigh the evidence on review or second-guess the jury's credibility determinations."). Viewing the evidence in the light most favorable to the government, the record is *not* devoid of evidence from which a reasonable jury could find Sewell guilty beyond a reasonable doubt of being a felon in possession of a firearm affecting interstate commerce.

*C.  Sentence Enhancements*

Sewell next challenges the sentence enhancements applied by the district court. We review a district court's application of the federal sentencing guidelines *de novo*, *United States v. Hinds*, 770 F.3d 658, 662 (7th Cir. 2014), and we review its factual findings for clear error, *United States v. Walsh*, 723 F.3d 802, 807 (7th Cir. 2007). At trial, a district court need only find by a preponderance of the evidence facts sufficient to support the enhancement. *United States v. Belk*, 435 F.3d

817, 819 (7th Cir. 2006). We will affirm a sentence enhancement unless the evidence leaves us with a "definite and firm conviction that a mistake has been made." *United States v. Johnson*, 489 F.3d 794, 796 (7th Cir. 2007). Here, we find no mistake in the imposition of either the firearm or the drug-quantity enhancement.

### 1.  Firearm Enhancement

We begin with the firearm enhancement. The district court determined that Sewell possessed a firearm *in connection with* his drug dealing, a decision that resulted in an offense level of 34 under U.S.S.G. § 4B1.4(b)(3)(A). Sewell challenges the district court's imposition of that enhancement. He argues that the firearm was for self-defense only.

Section 4B1.4(b)(3)(A) calls for an enhanced base offense level of 34 "if the defendant used or possessed the firearm … *in connection with* … a controlled substance offense." (emphasis added). The jury decided that Sewell possessed the firearm, a finding we leave undisturbed here. The only remaining question, then, is whether Sewell possessed that firearm "in connection with" his cocaine offense. We hold that he did.

This court defines the phrase "in connection with" rather "expansively." *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996) ("So long as … the firearm served some purpose with respect to the felonious conduct," the "'in connection with' requirement is satisfied; conversely, where the firearm's presence is merely coincidental to that conduct, the requirement is not met."). As such, "when guns are possessed along with the materials of a drug trafficker, it is a reasonable inference that the guns protect or embolden the criminal

enterprise." *United States v. LePage*, 477 F.3d 485, 489 (7th Cir. 2007). That is what happened here.

When the authorities searched Sewell's home, they not only found the loaded revolver underneath the bed. They also found scales, drug ledgers, cutting agents for cocaine, marijuana, and a large sum of cash in the dishwasher. These are the signs of a drug dealer, so it is reasonable to infer that the loaded revolver was meant to "protect or embolden the criminal enterprise." *LePage*, 477 F.3d at 489.

In *LePage*, police found a sawed-off shotgun in a duffle bag that also happened to contain large quantities of a cutting agent designed to dilute methamphetamine. *Id.* at 489. We reasoned that the presence of the cutting agent was "consistent with being a dealer and not simply a casual user of the drug." *Id.* So we affirmed the district court's imposition of the enhancement.

Although Sewell's firearm was located in his upstairs bedroom, it was still easily accessible to him. On this point, the district court made a relevant finding of fact: "The gun was found under the Defendant's side of the bed and was loaded. In this location and condition the gun was readily accessible to the Defendant and capable of being fired instantaneously." *United States v. Sewell*, No. 1:11-CR-35, 2013 U.S. Dist. LEXIS 170102, at *16–17 (N.D. Ind. Dec. 3, 2013). Sewell points to no evidence, and we find none, to characterize this finding as clearly erroneous.

Additionally, the firearm need not be found lying immediately next to the drugs or drug-dealing materials for the enhancement to apply. Analyzing a similar enhancement under U.S.S.G. § 2D1.1(b)(1) (possession of a firearm during

the commission of an offense), we affirmed where three firearms were found *in the same residence* as cocaine, cutting materials, scales, and other drug-dealing materials. *United States v. Franklin*, 896 F.2d 1063, 1065–66 (7th Cir. 1990). The Ninth Circuit has affirmed under similar circumstances. *United States v. Restrepo*, 884 F.2d 1294, 1295–96 (9th Cir. 1989) (affirming § 2D1.1(b)(1) enhancement where police found gun "hidden between the mattress and box spring of his bed" and numerous drugs and drug-dealing materials in the rest of the residence).

In sum, Sewell's argument is without merit. The fact that no one testified to seeing him use or possess the revolver in any drug transactions does little, if anything, to combat the overwhelming physical evidence found at Sawmill Woods Court. Moreover, this court has never required such testimony to support a § 4B1.4(b)(3)(A) enhancement. For all these reasons, we find no error in the imposition of the firearm enhancement.

### 2. *Drug-Quantity Enhancement*

Sewell also challenges the district court's imposition of a drug-quantity enhancement, which resulted in a base offense level of 34 for Count 2 under U.S.S.G. § 2D1.1(c)(3). To apply a base offense level of 34 under that section, a district court must find that a defendant possessed at least 15 kilograms but less than 50 kilograms of cocaine. *Id.* Here, the district court found that Sewell possessed between 30 and 40 kilograms of cocaine. Despite Sewell's arguments to the contrary, the district court's finding is not clearly erroneous.

Determining how much of a particular drug a defendant possessed, over a lengthy period of time, is not an exact sci-

ence. This fact is reflected in the Drug Quantity Table, which provides *ranges*, rather than precise weights, to determine proper base offense levels. U.S. Sentencing Guidelines Manual § 2D1.1(c) (2013). It is also reflected in our precedent. For example, a district court is allowed to make reasonable estimates of drug quantity based on the record before it. *United States v. Acosta*, 534 F.3d 574, 582 (7th Cir. 2008). Estimates are reasonable if they are grounded in "evidence possessing … sufficient indicia of reliability and not nebulous eyeballing." *United States v. Durham*, 211 F.3d 437, 444 (7th Cir. 2000) (internal quotation marks and citation omitted). Notably, witness testimony falls within that category of evidence. *United States v. Clark*, 538 F.3d 803, 812–13 (7th Cir. 2008) (affirming district court's determination of drug quantity where the court relied on witness testimony).

Here, Detective Martinez testified that, during the course of his pre-trial interview with Castaneda, Castaneda admitted to supplying Sewell with approximately 30 to 40 kilograms of cocaine from 2008 to 2011. The district court credited this testimony. Indeed, the district court's finding that Sewell possessed 30 to 40 kilograms of cocaine flows directly from it. It may be an estimate, but given this record, it is a reasonable one. We find no reason to disturb it on appeal. *See Clark*, 538 F.3d at 813 ("[A] sentencing court may credit testimony that is totally uncorroborated and comes from an admitted liar, convicted felon, or large scale drug-dealing, paid government informant.") (internal quotation marks and citation omitted). Further, that the testimony came in hearsay form gives us no pause. District courts may rely on hearsay testimony in formulating an appropriate sentence, "provided that the information has sufficient indicia of reliability

to support its probable accuracy." *Id.* at 813–814 (quoting U.S.S.G. § 6A1.3(a)).

Regarding the reasonableness of the district court's esti-mate, we note that Sewell and Castaneda met more than fifty times to exchange drugs and money. We also note that the search of Sawmill Woods Court revealed drug-dealing mate-rials consistent with substantial quantities of cocaine: cutting agents lidocaine and inositol; a drug ledger containing the words "cut coke"; two scales; plastic wrap with cocaine resi-due; and $19,900 in cash in the dishwasher, among other items. These facts lend "sufficient indicia of reliability" to the district court's finding that Sewell possessed 30 to 40 kilo-grams of cocaine. *Durham*, 211 F.3d at 444.

Sewell disagrees. He highlights other portions of Castenada's interview with Detective Martinez, and argues for a base offense level of 32, resulting from a drug quantity of at least 5 kilograms but less than 15 kilograms of cocaine. Sewell's math is relatively straightforward: Castaneda told Detective Martinez that he went to Sewell's residence 4 times to deliver cocaine, and that Sewell went to Castaneda's residence 4 times to pick up cocaine, for a total of 8 transactions. Castaneda also told Detective Martinez that their largest single transaction was 3 kilograms. Sewell argues that even if each of these transactions involved 3 kilograms (the largest amount), the total amount could not equal the district court's finding of 30 to 40 kilograms.

We reject this argument. In doing so, we emphasize that a district court's estimate on drug quantity, especially in a case like this one (where numerous drug transactions occurred over a lengthy period of time), need only be reasonable—not absolutely precise. Based on this record, the district court

made a reasonable estimate. In fact, the conservative end of its estimate—30 kilograms—is twice the amount needed to qualify for a base offense level of 34. And even if Sewell's math adds up, he discounts the other reasonable and possible equations—based on his preferred numbers—that still bring him over the threshold of 15 kilograms.

In sum, the experienced district court judge did not clearly err in determining that Sewell's criminal activity involved at least 15 kilograms but less than 50 kilograms of cocaine.

*D. Conditions of Supervised Release*

Although Sewell does not challenge his conditions of supervised release, we find we must vacate them and remand for re-sentencing in light of our recent decisions in *United States v. Thompson*, Nos. 14-1316, 14-1521, 14-1676, 14-1772, 2015 U.S. App. LEXIS 604 (7th Cir. Jan. 13, 2015), and *United States v. Siegel*, 753 F.3d 705 (7th Cir. 2014). *Thompson* and *Siegel* presented conditions of supervised release that are virtually identical to the ones here.

In *Siegel*, we vacated a number of conditions of supervised release that were "inappropriate, inadequately defined, or imposed without the sentencing judge's having justified them by reference to the sentencing factors in 18 U.S.C. § 3553(a)." *Id.* at 717. In *Thompson*, we reiterated our concern regarding these vague conditions, as well as the manner in which they are imposed. *See generally* 2015 U.S. App. LEXIS 604 (addressing four cases consolidated on appeal).

We cannot overlook the presence of plain error. *United States v. Muriel*, 418 F.3d 720, 723 n.1 (7th Cir. 2005) ("A court of appeals may notice plain error even though the error was not brought to the court's attention." (citing Fed. R. Crim. P.

52(b))). Relevant to the case at hand, the error need not be clear or obvious—or exist *at all*—at the time of sentencing. The error must, however, be "clear and uncontroverted *at the time of appeal*." *United States v. Ross*, 77 F.3d 1525, 1539 (7th Cir. 1996) (citing Fed. R. Crim. P. 52(b) (emphasis added)). It must also affect substantial rights and "seriously impugn the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cary*, 775 F.3d 919, 923 (7th Cir. 2014). That is what we have here.

### 1.  The Standard Conditions

The district court briefly imposed fifteen standard conditions of supervised release. "Further," the district court began, "the defendant shall comply with the 15 standard conditions that have been adopted by this court." (Sent. Tr. 14.) As in *Thompson*, the district court did not offer a reason for the imposition of these conditions. 2015 U.S. App. LEXIS 604 at *27–28 ("He gave no reasons for any of them. All he said was: 'The standard conditions are adopted by the Court.'"). We note that this procedure has generally been the norm. But now, for the reasons we recently articulated in *Thompson*, this approach to sentencing requires a remand.

It is not just the brief reference to the standard conditions; the conditions themselves also offend *Thompson*. The district court, for example, ordered Sewell to "answer truthfully all inquiries by the probation officer," and to "permit a probation officer to visit" him "at any time at home or elsewhere … ." But recently, in *Thompson*, we found these same conditions to be "too broad in the absence of any effort by the district court to explain why they are needed." *Id.* at *25. The same is true for these other conditions, which we now paraphrase:

- support dependents and meet family responsibilities;

- do not frequent places where controlled substances are illegally sold, used, distributed, administered;

- do not associate with any persons engaged in criminal activity or persons convicted of a felony; and

- notify third parties of the risks occasioned by his criminal record or personal history or characteristics.

*Id.* at *16–17. Under *Thompson*, these standard conditions must now be defined to provide a defendant with proper notice.

### 2. *The Special Conditions*

Likewise, the special conditions also require a remand. Consider the prohibition on mood-altering substances. In *Siegel*, we noted that this prohibition could proscribe everything from coffee to chocolate to blueberries, substances that "are not causal factors of recidivist behavior." 753 F.3d at 713–715. The General Equivalency Degree (GED) condition fares no better. The district court ordered Sewell to "obtain his GED at the direction of the probation officer." (Sent. Tr. 15.) But there are at least two problems with this condition. The first is that it is impossible to require someone to pass a test (the GED requires five tests), "unless cheating is permitted." *Thompson*, 2015 U.S. App. LEXIS 60, at *30 ("This is an example of an improper condition of supervised release that could be fixed by changing a single word"). The second problem, at least on this record, is applicability. *See Hinds*, 770 F.3d at 667. An exchange between the district court and Sewell highlights our concern:

> **The Court**: The defendant shall participate in a general equivalency degree, GED preparation course and obtain his GED at the discretion --
>
> **Defendant**: *I have a GED*.
>
> **The Court**: -- of the probation officer.

(Sent. Tr. 15 (emphasis added).) On remand, the district court will have the opportunity to examine the applicability of these conditions before they are re-imposed.

In sum, the general rule with regard to conditions of supervised release now requires that they are to fit the peculiar circumstances of the defendant being sentenced. They must also be defined in a way that puts defendants on notice of proscribed behavior. As a result, for the reasons we recently articulated in *Thompson* and *Siegel*, Sewell's sentence requires remand for reconsideration of the conditions of supervised release. *Siegel*, 753 F.3d at 717 ("So the prison sentences … stand, but the cases must be remanded for reconsideration of the conditions of supervised release").

### III.  CONCLUSION

We AFFIRM in part and VACATE in part. We AFFIRM the probable-cause determination of the magistrate judge and judgment of the district court regarding Sewell's guilt as a felon in possession of firearm. We further AFFIRM the firearm enhancement under U.S.S.G. § 4B1.1(b)(3)(A) and the drug-quantity enhancement under U.S.S.G. § 2D1.1(c)(3). We VACATE, however, each of Sewell's conditions of supervised release. We VACATE each condition because reconsideration of some conditions may impact the imposition of others. The sentenced is AFFIRMED in every other respect. The case is

REMANDED to the district court for proceedings consistent with this opinion.