In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 14-1237, 14-1585 & 14-1592

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTIAN J. MILLER, FRANK JORDAN, AND
JOSHUA N. BOWSER,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cr-00102-TWP-DML — **Tanya Walton Pratt**, *Judge.*

ARGUED FEBRUARY 10, 2015 — DECIDED MARCH 31, 2015

Before POSNER, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Joshua Bowser, Christian Miller, and Frank Jordan were convicted as part of a large-scale prosecution of people associated with the Indianapolis Chapter of the Outlaws Motorcycle Club. For those not familiar with the Club, it was founded in 1935 in the Chicagoland area as group of motorcycle enthusiasts, and its website now boasts chapters all over the world. *See* Outlaws

History, http://www.outlawsmcworld.com/history.htm (last visited Mar. 23, 2015). The Club, or at least some of its members, have had a spotty history of compliance with criminal laws. *See* Outlaws Motorcycle Club, Wikipedia, http://en.wikipedia.org/wiki/Outlaws_Motorcycle_Club (last visited Mar. 23, 2015). On appeal, the defendants challenge various aspects of their convictions and sentences. We remand in regard to a single issue related to a condition of Bowser's supervised release, a point on which the government confesses error. In all other respects, we affirm.

## I.    BACKGROUND

Following an extensive FBI investigation, in July 2012, a grand jury in Indianapolis returned an indictment against 42 people associated with the Outlaws, including Bowser. Miller and Jordan were added to the case later, along with seven others. Ultimately, a Second Superseding Indictment charged a total of 51 people with 49 criminal offenses. Nearly all of the accused pleaded guilty to all the charges against them. Bowser, Miller, and Jordan did not.

On September 5, 2013, Bowser pleaded guilty to ten crimes, including wire fraud, extortion, witness tampering, and conspiracy to distribute cocaine, but he pleaded nolo contendere to an eleventh charge for violating the Racketeer Influenced and Corrupt Organizations statute ("RICO"), 18 U.S.C. § 1962(c). In accepting Bowser's plea, the district court noted that pleading nolo contendere allowed Bowser to refuse to admit that the Outlaws acted as a criminal organization and thus maintain his membership in the group. But the court decided that this concern was outweighed by the time and expense saved by avoiding trial. At sentencing, however, the court denied Bowser a

reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, noting his nolo contendere plea and his refusal to admit that the Outlaws were a criminal enterprise or to accept that others conspired with him. Bowser nonetheless received a prison sentence of 180 months, well below the calculated guidelines imprisonment range of 235 to 293 months.

Meanwhile, on September 24, 2013, Miller proceeded to a jury trial on allegations of racketeering. Miller's defense focused on arguing that the government could not prove the robberies that it had charged as the predicate acts necessary for finding him guilty of a "pattern" of racketeering under § 1962(c). In particular, Miller argued that an incident where he confronted another Outlaws member, Bryan Glaze, about stealing from the Outlaws was not actually a robbery because Glaze knew what would happen as a result of him having stolen from the Outlaws.

According to testimony at trial, Miller confronted Glaze at the Outlaws clubhouse because Glaze had stolen from the Club while performing his duties of ordering and collecting money from other members for Outlaws merchandise. During the confrontation, Miller pushed Glaze, and another Outlaws member pointed a gun at Glaze and told him they were not "fucking around." Miller then demanded that Glaze turn over his jewelry and clothing with the Outlaws insignia. Altogether approximately 17 Outlaws were present. One of those present was asked at trial if Glaze turned over the items voluntarily or by threat of force and responded, "Oh, by threat." The Outlaws also took Glaze's personal items, including a television, stored in the Club's bunkhouse, though Glaze said they did so "without [his]

knowledge." As described by an eyewitness, this meant that the Outlaws went and removed the property while Glaze was confined to a chair and "couldn't move." Bowser then summoned a tattoo artist to cover up Glaze's Outlaws tattoos. Glaze said that the other Outlaws "made it clear if [he] didn't cooperate with them, [he] probably wouldn't have walked out of there." The jury found Miller guilty of racketeering, and the district court sentenced him to 60 months' imprisonment.

Lastly, on November 4, 2013, Jordan went to trial for conspiracy to distribute cocaine, 21 U.S.C. § 846, and unlawful use of a communication facility, *id.* § 843(b). His trial lasted three days, during which the jury heard testimony from numerous law enforcement officers involved in investigating his illegal activities and from two of his co-defendants, Hector Nava-Arredondo ("Nava") and James Stonebraker. According to the trial testimony, Nava sold cocaine at Sidewinders, a bar in Indianapolis where Jordan was a bouncer, in exchange for providing cocaine to the bar's owner. (Sidewinders might be described as an Outlaws hangout.) Both Jordan and Stonebraker sold drugs that Nava provided to them. The FBI became aware of Jordan's potential involvement in drug distribution after wiretapping Nava's telephone as part of the larger Outlaws investigation.

The government also played the jury several recordings of intercepted telephone conversations between Jordan and Nava. Before the recordings were played, Nava testified that Jordan would typically call him when "he needed drugs to sell to a client, a customer that he had." The government then played a recording in which Nava asked Jordan, "You want some?," and Jordan responded, "Yep, they just called

me." Nava explained that he understood Jordan to be referring to his customer wanting drugs. The government also played a call in which Jordan told Nava that he "need[ed] another biscuit," which Nava understood to mean that Jordan needed 3.5 more grams, also known as an "eight ball," of cocaine. There was also a phone call where Jordan told Nava that someone—who Nava understood to be Jordan's customer—was on his way, and Nava told Jordan to bring money and meet him on the street.

Nava testified that, based on these conversations, he believed that he had an agreement with Jordan to provide Jordan with cocaine for Jordan to distribute to Jordan's customers. Nava explained that he provided Jordan with an eight ball of cocaine once per week—at a cost of $140 each— for approximately six months, until Nava's arrest in 2012. (An FBI agent explained that, during the investigation in this case, the street value of an eight ball of cocaine was approximately $150, and that the typical dosage of cocaine is "less than a gram, maybe a 16th of a gram.") Jordan usually paid cash, Nava said, but Nava also fronted him cocaine on two or three occasions. Nava also explained that he frequently fronted cocaine to another person, Abraham Flores, who would also sometimes give cocaine to Jordan to resell. Nava said that he occasionally shared the proceeds of his drug sales with Jordan. On cross-examination, Nava indicated that he did not care whether Jordan resold the cocaine or used it himself.

During Stonebraker's testimony, he explained that he began purchasing cocaine at Sidewinders in 2010 after Bowser took him to the bar and asked the owner to introduce him to a cocaine supplier. Initially, Stonebraker

and Bowser bought drugs from Flores, and Stonebraker
would receive an eight ball two or three times per week.
After two months, however, Stonebraker began dealing
instead with Nava and purchased a quarter to a full ounce
from him three to four times per week for roughly a year
and a half. Stonebraker used cocaine himself and sold it to
others, particularly members of the Outlaws. While waiting
for Nava, Stonebraker said that he witnessed other people
come to Sidewinders and buy cocaine from Jordan. This
happened once or twice per weekend, with Jordan typically
selling small quantities of cocaine (from .1 to 1 gram) that he
would parcel off from a larger quantity he kept in a baggie.
According to Stonebraker, Nava introduced Stonebraker to
Jordan because they both bought cocaine from Nava, and
Nava told Stonebraker that he could get cocaine from Flores
or Jordan if Nava was unavailable. Stonebraker added that,
on two or three occasions, he saw Jordan buy cocaine from
Flores, who told Stonebraker that he was Jordan's primary
cocaine source, though Jordan also received drugs from
Nava.

The jury found Jordan guilty of distributing cocaine and
also specifically found him accountable for distributing 500
or more grams of the drug. After trial, Jordan moved for
acquittal, *see* Fed. R. Crim. P. 29, on the basis that the
government had presented insufficient evidence to sustain
his conviction for conspiracy to distribute cocaine. In
denying the motion, the district court emphasized that Nava
had testified that he fronted Jordan cocaine two or three
times and had agreed with Jordan that Jordan would resell
drugs. The court also cited Nava's testimony that over the
course of six months Jordan frequently bought cocaine from

him to resell, and Stonebraker's testimony that he was told he could buy drugs from Jordan if Nava was unavailable.

At sentencing, the district court concluded, over Jordan's objection, that he had a prior felony drug conviction, giving rise to a mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(B). The court then imposed the minimum prison term of 120 months.

## II.    DISCUSSION

Bowser, Miller, and Jordan consolidated their appellate briefing. Because the bulk of the issues raised in these briefs relate to Jordan, we begin there.

### A.  Jordan

Jordan first challenges the sufficiency of the evidence supporting his conviction for conspiracy to distribute cocaine. Where, as here, a defendant challenges the sufficiency of the evidence by moving for acquittal after trial, we will uphold the jury's verdict if, viewing the evidence in the light most favorable to the government, any rational trier of fact finder could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Molton*, 743 F.3d 479, 483 (7th Cir. 2014); *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014). We have referred to this standard as "a nearly insurmountable hurdle," recognizing that we will reverse "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Torres-Chavez*, 744 F.3d at 993 (quotation and alteration omitted); *accord United States v. Domnenko*, 763 F.3d 768, 772 (7th Cir. 2014).

Looking to the elements of conspiracy, the Supreme Court "has repeatedly said that the essence of a conspiracy is 'an agreement to commit an unlawful act.'" *United States v. Jimenez Recio,* 537 U.S. 270, 274 (2003) (quoting *Iannelli v. United States,* 420 U.S. 770, 777 (1975)). But as Jordan emphasizes, although the "drug sale is itself an agreement," that sale "cannot also count as the agreement needed to find conspiracy." *United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013). Thus, "when the alleged co-conspirators are in a buyer-seller relationship, 'we have cautioned against conflating the underlying buy-sell agreement with the drug-distribution agreement that is alleged to form the basis of the charged conspiracy.'" *United States v. Villasenor*, 664 F.3d 673, 679 (7th Cir. 2011) (quoting *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010)). Rather, in these situations, "'the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals.'" *United States v. Claybrooks*, 729 F.3d 699, 704 (7th Cir. 2013) (quoting *United States v. Vallar,* 635 F.3d 271, 286 (7th Cir. 2011)). In other words, to convict Jordan of conspiracy to distribute cocaine, the government needed to show that he "'knowingly agreed—either implicitly or explicitly—with someone else to distribute drugs.'" *Villasenor*, 664 F.3d at 679 (quoting *Johnson*, 592 F.3d at 754).

The district court appropriately summarized this case law for the jury using the buyer–seller instruction from pattern jury instructions developed by a committee appointed by this court. *See* Committee on Federal Criminal Jury Instructions for the Seventh Circuit, Pattern Criminal Jury Instructions of the Seventh Circuit 5.10(A) (2012), *available                                                                  at*

http://www.ca7.uscourts.gov/Pattern_Jury_Instr/7th_crimina
l_jury_instr.pdf. According to that instruction, "a buyer and
seller of cocaine do not enter into a conspiracy to possess
cocaine with intent to distribute simply because the buyer
resells cocaine to others, even if the seller knows that the
buyer intends to resell the cocaine." *Id.* at 73. Instead, "the
government must prove that the buyer and seller had the
joint criminal objective of distributing cocaine to others." *Id.*;
*see Brown*, 726 F.3d at 997–1004 (discussing the reasoning
behind the current pattern instruction).

Jordan insists that the government failed to meet its
burden because it did not show that his dealings with Nava
went beyond the relationship of a buyer and seller. He
acknowledges that Nava interpreted their phone calls as an
agreement for Jordan to resell the drugs, and that this
relationship persisted for roughly six months, with Nava
sometimes fronting Jordan cocaine, or sharing the proceeds
of his drug sales with him. But he points to our admonition
in *Brown*, 726 F.3d at 999, that transactions "exhibiting
frequency, regularity, and standardization, do not evince the
substantial relationship entailed in a conspiracy."
*See also United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008)
(warning against the notion that wholesale purchases of
cocaine are per se proof of conspiracy). In *Brown* we also
acknowledged that, although it is "generally
uncontroversial" that "if a person buys drugs in large
quantities (too great for personal consumption), on a
frequent basis, on credit, then an inference of conspiracy
legitimately follows," it is "[l]ess clear … what combinations
of those three characteristics—a credit arrangement, a large
quantity, and frequent sales—are sufficient." 726 F.3d at
1000. Jordan emphasizes that he purchased only 3.5 grams of

cocaine per week—an amount he maintains is consistent with personal use—and that there were only as many as three sales on credit.

Although we have not always been clear on what factors point to the existence of a conspiracy, we have stressed the need to "not lose sight of the larger picture—deciding whether the jury reasonably discerned an agreement to further trafficking of drugs." *Id.* at 1002. And here, as the district court emphasized, Nava testified that, based on his telephone conversations with Jordan, he understood that he had a relationship with Jordan that went beyond that of buyer and seller and included an agreement for Jordan to further distribute the drugs Nava provided.

Jordan asserts that his conversations with Nava could be interpreted differently, but Nava's interpretation was not only reasonable but bolstered by additional evidence at trial. Stonebraker testified, for example, that he witnessed Jordan selling cocaine at Sidewinders, and that Nava told Stonebraker that Jordan received cocaine from him and that Stonebraker could get cocaine from Jordan if Nava was unavailable. Additionally, although Jordan maintains that buying cocaine at a rate of 3.5 grams weekly is consistent with personal use, according to the testifying FBI agent, that quantity, even spread over the course of a week, would be at the high end of the typical dosage for a single user. Moreover, there was evidence that Nava was not Jordan's only supplier. We are persuaded that the trial evidence, viewed in the light most favorable to the government, was sufficient for a rational trier of fact to find Jordan guilty of conspiracy. *See United States v. Moon*, 512 F.3d 359, 364 (7th Cir. 2008) (upholding conspiracy conviction when recorded

conversations implied that buyer and seller had worked together and a jury could infer that seller extended credit to buyer); *United States v. Lechuga*, 994 F.2d 346, 350–51 (7th Cir. 1993) (en banc) (upholding conspiracy conviction based on testimony from buyer that seller agreed to sell him drugs for the buyer's customer).

Jordan next seeks to undermine the government's questioning of Stonebraker and Nava at trial, arguing that the prosecutor asked improper leading questions. In particular, he challenges this question to Stonebraker: "Going to the point where Hector Nava introduced you to Frank Jordan, yes or no, did Mr. Nava make any statements to you about people you could go to to get cocaine from, other than Mr. Jordan?" (Jordan quotes the end of this question as "other than Mr. [Nava]," asserting that the transcript's use of "Jordan" is a misprint. In context, "Nava" might make more sense, but our resolution of this issue does not require us to settle this difference.) Stonebraker answered, "yes," and then named Jordan and Flores as people he could get cocaine from if Nava was unavailable. Jordan asserts that this was the only testimony indicating that Nava's customers could buy drugs from Jordan in Nava's absence.

We review the court's treatment of leading questions for abuse of discretion, *see United States v. O'Brien*, 618 F.2d 1234, 1242 (7th Cir. 1980), and see none here. A question is leading if "phrased in such a way as to hint at the answer the witness should give." *United States v. Cephus*, 684 F.3d 703, 707 (7th Cir. 2012). Here, however, the question was ambiguous enough that we cannot say that trial judge abused her discretion in allowing it. Moreover, although

leading questions "should not be used on direct examination except as necessary to develop the witness's testimony," Fed. R. Evid. 611(c), "[t]here is no blanket prohibition of such questions," and they are permissible if "used with friendly witnesses to move direct examination along rather than to elicit testimony damaging to the opposing party that the witness might not have given in response to a neutral question." *Cephus*, 684 F.3d at 707. Jordan has not convinced us that Stonebraker or Nava would have testified any differently if presented with unambiguously neutral questions.

Jordan also challenges the district court's decision to bar questions about Stonebraker's 1974 felony conviction for heroin possession. As part of the Outlaws prosecution, Stonebraker pleaded guilty to multiple drug-distribution charges and received a 30-month sentence. But if convicted in an Indiana state court, Jordan argues, Stonebraker would have faced a mandatory 20-year sentence because of the earlier state felony. Jordan thus wanted to use testimony about the conviction to suggest Stonebraker was biased and argues that the decision barring this testimony deprived him of his Sixth Amendment right to confront Stonebraker.

We disagree. Jordan relies on *United States v. Martin*, 618 F.3d 705, 727–29 (7th Cir. 2010), which held that it was error to preclude cross-examination about a witness's involvement in a pending, unrelated murder investigation, and *Delaware v. Van Arsdall*, 475 U.S. 673, 676–80 (1986), which held that it was error to preclude questions about the dismissal of a witness's unrelated criminal charge being dropped in exchange for his testimony. But both *Martin* and *Van Arsdall* involved situations where there was evidence

that the witnesses at issue had been recently investigated by state officials, while here there is no indication that state officials considered charging Stonebraker. Rather, as the government notes, Stonebraker testified that he cooperated in hopes that it would help with the federal charges against him. Jordan gives no persuasive reason to believe that the probative value of testimony about Stonebraker's nearly 40-year-old conviction would substantially outweigh its prejudicial effect, as required for admission under Federal Rule of Evidence 609(b)(1). The district court thus properly excluded testimony about the prior conviction.

In regard to his sentence, Jordan argues that the government failed to prove that he was convicted of a prior drug felony for purposes of the 10-year mandatory minimum under § 841(b)(1)(B). Under existing precedent, the existence of a prior felony conviction is considered a sentencing factor that may be determined by a judge. *United States v. Zuniga*, 767 F.3d 712, 718 (7th Cir. 2014); *United States v. Boswell*, 772 F.3d 469, 478 (7th Cir. 2014). When a defendant challenges the existence of a prior conviction, as Jordan did, the government must prove it beyond a reasonable doubt. 21 U.S.C. § 851(c)(1); *United States v. Arreola-Castillo*, 539 F.3d 700, 704–05 (7th Cir. 2008). We review for clear error the factual determinations the district court makes in the course of concluding that the evidence is sufficient. *Arreola-Castillo*, 539 F.3d at 703.

The government presented three pieces of evidence to prove the existence of Jordan's earlier conviction. First, the government submitted a certified copy of a court record from Marion County, Indiana, showing that a person with the name Frank Jordan was convicted of cocaine possession

in 2007. The government also submitted a computer printout from Marion County's records system listing the same case number, along with Jordan's name, and a social security number and birth date matching those given in Jordan's presentence report in this case. Finally, the government provided a police report related to the state conviction showing the charge, Jordan's name, and the birth date listed in the court's record system.

Jordan argues that this evidence was insufficient, noting that the documents contain hearsay and that the presentence report contains two possible birthdays. He also points to *United States v. Kellam*, 568 F.3d 125, 144–45 (4th Cir. 2009), which held that court records related to an earlier conviction did not suffice to link a defendant to that conviction, even though the documents contained the defendant's name and a partially redacted social security number and birthday. *See also United States v. Green*, 175 F.3d 822, 835–36 (10th Cir. 1999) (holding that proof of earlier convictions under defendant's aliases not sufficient). Jordan argues that the court here should have required the government to produce photographs or fingerprint analysis establishing that he was the same Frank Jordan that committed the prior felony.

This argument is unpersuasive. First, as Jordan acknowledges, the rules of evidence are inapplicable to sentencing hearings, Fed. R. Evid. 1101(d)(3), so the use of hearsay evidence here did not amount to reversible error, *see United States v. Sewell*, No. 14-1384, 2015 WL 1087750, at *9 (7th Cir. Mar. 13, 2015) ("District courts may rely on hearsay testimony in formulating an appropriate sentence, 'provided that the information has sufficient indicia of reliability to support its probable

accuracy.'" (quoting *United States v. Clark*, 538 F.3d 803, 813–14 (7th Cir. 2008))). Furthermore, in both *Kellam* and *Green*, unlike here, there were discrepancies between the names on the documents related to the earlier convictions and the case at hand. And critically, neither case involved the matching of full social security numbers. Jordan had the presentence report listing his social security number in advance of sentencing and never objected to it as incorrect. We thus see no need for the government to have produced photographs or fingerprints related to the seven-year-old prior conviction, especially since Jordan proffered nothing to refute the government's evidence. Accordingly, the district court properly accepted the government's evidence as proof beyond a reasonable doubt that Jordan had a prior felony drug conviction.

### B. Miller

Miller raises only one argument: that the government failed to prove that the incident where he and others expelled Glaze from the Outlaws amounted to a robbery. The government charged Miller with violating 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The showing of a pattern of racketeering activity "requires at least two acts of racketeering activity," 18 U.S.C. § 1961(5), and those acts can include robberies chargeable under state law, *id.* § 1961(1); *United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003). (Miller does not challenge on appeal the

government's proof of a second predicate act—another robbery committed a month before the robbery at issue.) Under Indiana law, a person commits robbery when he knowingly or intentionally takes property from another person by threatening use of force, Ind. Code § 35-42-5-1(1), and is liable for the offense even if he aided or induced its commission, *id.* § 35-41-2-4.

Miller argues that he and his fellow Outlaws did not commit robbery because, in his view, their demanding that Glaze turn over Outlaws items was separate from any displays of force. Miller also argues that this divestment of property was expected as part of removal from the Club. Miller admits, however, that "there was certainly overlap between the force used on Glaze and the taking of property," and according to an eyewitness, Glaze turned over his items not voluntarily, but "by threat." The Outlaws present also removed Glaze's personal items while he was confined to a chair and, Glaze testified, "made it clear if [he] didn't cooperate with them, [he] probably wouldn't have walked out of there." We thus conclude that the displays of force against Glaze were part of the same event as the taking of his property and, construing the facts in the light most favorable to the government, constituted a chargeable offense of robbery under Indiana law.

### C.  Bowser

Bowser challenges only his sentence, first arguing that the district court erred by relying on the nature of his plea of nolo contendere to the RICO charge (Count 1 of the Second Superseding Indictment) to deny him a sentencing reduction for acceptance of responsibility. A plea of nolo contendere, Bowser notes, "admit[s] every essential element of the

offense that is well pleaded in the charge" and thus "is tantamount to an admission of guilt for the purposes of the case." *Lott v. United States*, 367 U.S. 421, 426 (1961) (quotation and alterations omitted). Bowser emphasizes that he pleaded guilty to ten underlying offenses and contends that the court applied a per se rule that a nolo contendere plea precludes the acceptance reduction—a rule, he says, that no circuit has adopted. He argues that the court instead should have addressed the factors listed in U.S.S.G. § 3E1.1, cmt. n.1, and considered how he saved judicial resources by avoiding trial.

Under U.S.S.G. § 3E1.1(a), a district court is to provide a two-level reduction in a defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." The court here explained its reasons for denying the reduction as follows:

> [W]hile Mr. Bowser has admitted his guilt to the underlying acts involved in Count 1, because he neither admits nor disputes his guilt in Count 1 through his nolo contendere plea, … he's not taken responsibility or accepted responsibility for his actions. Mr. Bowser has not admitted that the Outlaws Motorcycle Club was a criminal enterprise. He will not admit and accept responsibility for the fact that others did conspire with him. He just says others in general. So the Court is not going to give the two level.

Bowser argues that everything in this explanation is simply a restatement of the nature of his nolo contendere plea. But we disagree. In our view, the court went beyond

relying solely on the nature of Bowser's plea by citing specific facts about how he refused to acknowledge the Outlaws as a criminal organization or identify his co-conspirators. Bowser insists that his actions can be explained by the fact that he views the Outlaws as his family, and as the district court explained in accepting his plea, acknowledging the Outlaws as criminal would likely lead to his expulsion.

But because the district court evaluated the facts surrounding Bowser's plea and made specific observations about his refusal to acknowledge his association with a criminal organization, we are not persuaded that the court committed reversible error in denying Bowser the reduction for acceptance of responsibility. Even a defendant who pleads guilty "is not entitled to an adjustment under [§ 3E1.1] as a matter of right." U.S.S.G. § 3E1.1, cmt. n.3; *see United States v. Dachman*, 743 F.3d 254, 259 (7th Cir. 2014); *United States v. Panice*, 598 F.3d 426, 435 (7th Cir. 2010). Rather, the sentencing judge is given discretion to make factual findings about the defendant's credibility and conduct, and we review those findings for clear error, giving "great deference to the sentencing judge because [she] is in a 'unique position to evaluate a defendant's acceptance of responsibility.'" *Dachman*, 743 F.3d at 260 (quoting *United States v. Frykholm*, 267 F.3d 604, 610 (7th Cir. 2001)). "The findings of the trial judge in sentencing will only be reversed if the decision lacks any foundation or the court is 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Seidling*, 737 F.3d 1155, 1162 (7th Cir. 2013) (quoting *United States v. Souffront*, 338 F.3d 809, 832 (7th Cir. 2003)). Even considering Bowser's motivation for pleading as he did, we are not convinced that

the court clearly erred in finding he had not accepted responsibility for purposes of § 3E1.1.

This analysis is in line with our approach recently in *Dachman*, 743 F.3d at 261 n.2, in which we declined to decide whether a nolo contendere plea alone precludes a finding of acceptance of responsibility when "other facts were more than sufficient to justify the district court's denial of acceptance of responsibility." As the government notes, it also conforms with the approach of other circuits, which have upheld the denial of the § 3E1.1 sentencing reduction to defendants entering similar pleas when the trial court relied on additional facts beyond the nature of the plea. *See, e.g., United States v. Harris*, 751 F.3d 123, 125, 127 (3d Cir. 2014) (upholding denial of acceptance reduction even though "a nolo contendere plea does not automatically preclude a district court from granting such a reduction"); *United States v. Harlan*, 35 F.3d 176, 181 (5th Cir. 1994) (upholding denial of acceptance reduction and noting that *Alford* plea was relevant, but not a disqualifying factor, for applying the reduction).

Moreover, although Bowser emphasizes that he prevented the expense of trial, we have rejected the argument that a defendant is "entitled to the reduction because his nolo contendere plea saved the government and district court the time and expense of a long and complicated trial." *United States v. Boyle*, 10 F.3d 485, 490 (7th Cir. 2010). It is true that one of the underlying purposes for the sentencing reduction under § 3E1.1 "is to reduce the burdens of trial to prosecutors, judges, victims, jurors, and witnesses by inducing defendants to plead guilty." *United States v. Gonzalez*, 608 F.3d 1001, 1008 (7th Cir. 2010). But

because the reduction serves many other purposes—"the societal interest in crime reduction, restitution, rehabilitation, early withdrawal from criminal activity and withdrawal of criminals from positions of trust and responsibility"—adopting a rule mandating the reduction solely for avoiding the costs of trial "would ignore these other purposes and emasculate the Guideline." *Boyle,* 10 F.3d at 490.

Bowser also argues that the district court erred in imposing a condition of supervised release authorizing suspicionless searches of his person, home, and effects. The government confesses error, acknowledging that *United States v. Farmer*, 755 F.3d 849, 854 (7th Cir. 2014), concluded that a condition of release authorizing suspicionless searches is improper when the court does not connect that condition to the underlying offense. Here, the court said only that the search condition was imposed based on "the nature of the instant offense," without elaborating. Given the brevity of the court's comment, we accept the government's confession of error.

We have considered the additional arguments presented in the appellants' briefs, including Jordan's arguments regarding his right to a speedy trial and inaccuracies in Stonebraker's testimony about Stonebraker's drug use, but we do not believe that these arguments warrant discussion beyond that of the district court in its rulings on those issues. Accordingly, the judgments against Jordan, Miller, and Bowser are AFFIRMED, with the exception that Bowser's case is REMANDED to the district court for further consideration of the term of his supervised release authorizing suspicionless searches.