In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3269

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY T. MOORE, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:13-cr-30212-DRH-1— **David R. Herndon**, *Judge.*

ARGUED FEBRUARY 24, 2015 — DECIDED APRIL 24, 2015

Before EASTERBROOK, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Anthony T. Moore, Jr. was convicted
of interference with commerce by robbery, in violation of 18
U.S.C. §§ 1951 and 2. He challenges the district court's decision
to run his 235-month federal sentence consecutive to sentences
imposed in state court for attempted murder, aggravated
battery and possession with intent to deliver a controlled
substance. We affirm.

**I.**

On December 17, 2012, United Parcel Service ("UPS") driver Steven Roberts was returning to his delivery truck after attempting to deliver a package when he noticed a man walking down the middle of the street. A blue minivan drove slowly behind the man, trailing him by approximately two car lengths. Roberts returned the undelivered package to the back of his truck and then took his place in the driver's seat. The man, later identified as Moore, appeared next to him, armed with a revolver. Roberts ran from the truck, but slipped and fell in the mud between two houses. Moore caught up to him and threatened to shoot him if he ran again. With the gun trained on Roberts, Moore walked Roberts back to the truck and told him to drive. Moore crouched down on the passenger side of the truck's cab and directed Roberts to a dead-end street marked by abandoned houses and overgrown shrubbery.

During the ten- to fifteen-minute drive, Roberts noticed that the blue minivan that had trailed Moore earlier was now following the delivery truck. As Roberts drove, Moore told him, "Don't make me kill you," and "Don't get killed over somebody else's stuff, so just do like I say. Just do like I say." Tr. at 65. At times, Moore seemed "antsy and agitated" and at other times he was calm. Roberts took the opportunity of a calm moment to plead for his life, asking Moore not to kill him, and explaining that he had a wife and two children whom he wanted to see grow up. When they reached the dead-end street, Moore directed Roberts to park and turn off the truck. The minivan pulled in nearby, and after Moore made a phone call to a woman, another vehicle arrived on the scene. Moore

directed Roberts to sit in the driver's seat and keep his head down. The drivers of the blue minivan and the second vehicle then began to unload packages from the UPS truck and place them in the minivan and the other vehicle. Roberts began to think that "this is it, that this is my last day on earth, this is—you know, once they're done—considering the location, and once they're done, I thought I was going to die back there on that road." Tr. at 66-67.

As the unloading progressed, an older couple in a Dodge Durango drove towards the UPS truck. At this point, Moore was crouched down in the passenger area with his gun pointed at Roberts. Moore whispered, "Don't say anything. I'll shoot you." The couple slowed as they passed the UPS truck and asked Roberts, "Is everything ok?" Roberts nodded at them and they drove on. Tr. at 68. The incident agitated Moore and he directed Roberts to drive to a second location approximately five minutes away. When they arrived at the second location, Roberts noticed that the drivers of the blue minivan and the other vehicle were gone, taking with them the packages that had already been unloaded. Moore directed Roberts to push the remaining packages closer to the back of the UPS truck so that it would be easier to finish unloading the truck. Moore also directed Roberts to open some packages to determine if the contents were worth stealing. Someone returned to continue unloading the truck. After the remaining packages were unloaded, Moore directed Roberts to go to the back of the truck and sit on the floor. Roberts told the jury:

> [S]o I sat there. By now I'm robotic. I'm just—it's like I was in out-of-body kind of thing. I was there but I wasn't, and I was just doing what he said. And he

> told me to sit there, so I sat there and I put my head down and he was standing up over me with the gun pointed to me, and so I figured, well, they've taken everything and that he was 'fin to kill me. I put my head down and I just ask the Lord—I just put my head down and asked the Lord to receive my soul because of where we were located, that now they're done, I just figured he—I knew he was going to just kill me and leave me there. It was an isolated area. I was—I just thought I was dead so I had already accepted to die.

Tr. at 73.

But Moore did not pull the trigger. Out of the corner of his eye, Roberts saw Moore back away and leave the UPS truck. Roberts then heard a car door slam and tires peeling off in the rocks. After a few moments of paralyzed shock, Roberts heard a little voice in his head say, "Steve, get up." Tr. at 74. Moore had disabled Roberts' cell phone by removing the battery so he got into the driver's seat and drove to a store that was a regular stop on his delivery route. The workers at the store called the police, and Roberts called his wife and his supervisors at UPS. The incident had lasted for an hour and forty minutes, and Moore had not lowered his gun until he fled the UPS truck.

As investigators later learned, the blue minivan was driven by Janneka Adams and the other vehicle was driven by Victoria Walker. Both were romantically involved with Moore, and Walker was the mother of Moore's son. Walker had rented the blue minivan the prior week for Moore to use on a trip. After the robbery, the stolen packages were taken to Walker's

home and the three divided up the spoils. Among the items taken from the truck were hair extensions that regularly sold for $100 each in retail establishments. A day or two after the robbery, Walker called her fifteen-year-old friend, J.B., and offered to sell some of the hair extensions for $5 each. J.B. readily agreed to the deal and Walker then drove to J.B.'s home with Moore and Moore's cousin. J.B. completed the purchase and asked Walker to fix the extensions in her hair. Walker agreed to do so and the foursome then drove to a nearby store to purchase hair glue.

A UPS truck was parked at the store, and as they passed it, Moore said, "Round 2." Walker told Moore that he was talking too much. J.B. then purchased the hair glue and the group began to drive to Walker's home. They saw a Federal Express truck on the road, and Moore said, "That's the truck I really want." Walker again admonished Moore, telling him that he was talking too much and that there were "too many ears around." After they arrived at Walker's house, Walker placed the hair extensions in J.B.'s hair and then left for work. J.B. remained at Walker's home for a time watching television with Moore. A news report came on describing the UPS robbery. Moore then received two phone calls in quick succession, including one from Walker. Moore complained about Walker talking to him "about this" while she was at work and told her they would discuss it when she returned home. J.B. decided to leave and asked Moore to walk her to the Metrolink station. On the way to the station, Moore pulled out a handgun and said, "What if I was to shoot you in your head right here?" J.B. told Moore not to play with her and told him she no longer wanted his company. She continued to the station by herself and went

home. J.B. had seen other unusual items at Walker's house that day including additional hair extensions, cell phones, jewelry and sports hats. At that point, she surmised that Moore and Walker had robbed a UPS truck and that Moore wanted to rob a Federal Express truck as well. She took Moore's question about shooting her in the head as a threat to kill her to prevent her from telling authorities what she knew.

Later that night, at approximately 2:00 a.m., Walker returned to J.B.'s home and invited her to come out to smoke marijuana. J.B. accepted the invitation and Walker then drove J.B. to a viaduct where Moore was waiting with a gun. Moore immediately threatened J.B. again, saying, "You ran around here snitching. I'm 'fin to kill you, B." The details of what happened next came out later in a state court trial, but were not admitted during the federal trial that is the subject of this appeal. After threatening J.B., Moore threw J.B. into a ditch and fired three shots at her. One bullet hit her in the head, one struck her hip, and one missed her entirely. J.B. played dead until Moore and Walker left. She then managed to walk home and summon an ambulance.

As a result of the shooting of J.B., Moore was charged in state court with one count of attempted first degree murder and two counts of aggravated battery. A jury found him guilty on all three counts and the state court sentenced him to thirty-four years' imprisonment. In a separate state case, Moore pled guilty to possession with intent to deliver a controlled substance. He was sentenced on that charge to four years' imprisonment, to run consecutive to the thirty-four year sentence for attempted murder and aggravated battery. For hijacking the UPS truck, Moore was charged in federal court with one count

of interference with commerce by robbery, in violation of 18 U.S.C. §§ 1951 and 2. He was convicted and sentenced to 235 months' imprisonment. The district court judge decided to run Moore's federal sentence consecutive to (rather than concurrent with) his state court sentences. It is that decision that Moore challenges on appeal.

## II.

Our review of sentencing decisions generally is limited to whether they are reasonable, applying the abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. Aslan*, 644 F.3d 526, 531 (7th Cir. 2011). In the usual case, we first must ensure that the district court committed no significant procedural error, including, among other things, incorrectly calculating the guidelines range, or failing to explain adequately the chosen sentence. *Gall*, 552 U.S. at 51; *Aslan*, 644 F.3d at 531. But Moore does not claim any procedural error. He concedes that his 235-month sentence is within the properly calculated guidelines range. He challenges only the substantive reasonableness of the district court's decision to run his entire federal sentence consecutive to his state sentence, a decision that added nearly twenty years to his thirty-eight year state sentence. We therefore review the district court's decision for abuse of discretion.

The parties agree that the properly calculated guidelines range for the offense of conviction was 188 to 235 months, as recommended by the Presentence Investigation Report ("PSR"). That recommendation included a two-level adjustment for obstruction of justice because Moore shot J.B. in order to keep her from reporting the crime. *See* U.S.S.G. § 3C1.1.

Because the PSR characterized the attempted murder of J.B. as relevant conduct to the offense of conviction, Moore was assessed no criminal history points for his state court conviction. The PSR then determined that guideline 5G1.3(b) applied because the offense level was increased based on conduct which resulted in a term of imprisonment. That is, Moore's offense level was increased by two levels under the obstruction of justice provision for the attempted murder of J.B., a crime for which he received a separate state court sentence. At the time of Moore's sentencing, section 5G1.3(b) provided:[1]

> If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct) and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows:
>
> (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

---

[1] Subsections (b) and (c) of guideline 5G1.3 were amended in November 2014.

(2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

U.S.S.G. § 5G1.3(b).[2] Because the PSR concluded that "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction," subsection (b)(2) directed that Moore's sentence for interference with commerce by robbery run concurrently with his state court sentence for attempted murder.

The government objected to the application of guideline 5G1.3(b), contending instead that subsection 5G1.3(c) applied. At the time of Moore's sentencing, that subsection provided:

(c) (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

U.S.S.G. § 5G1.3(c). According to the government, Moore would have received a sentencing enhancement for obstruction of justice based solely on his threats to J.B., threats for which he

---

[2] Subsection (a) provides, "If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment." Subsection (a) did not apply, thus satisfying the first condition for applying subsection (b).

was never separately prosecuted. Thus, the government contended, Moore's state court sentence for attempted murder was not "the basis for an increase in the offense level for the instant offense." Rather, the basis for the increase was the two threats that Moore issued to J.B. before he shot her. The district court declined to apply subsection 5G1.3(c). The court agreed that Moore's threats alone would have been sufficient to support an obstruction of justice enhancement but that Moore's obstruction continued beyond the threats to the actual attempted murder of J.B., in an "ongoing effort to obstruct justice and to silence [J.B.]." Sent. Tr. at 14-15. *See also* Sent. Tr. at 16 (where the district court remarked, "I agree that obstruction was established once the threat was made. I just don't believe that we end there with the obstruction. The obstruction continued."). The court thus treated the obstruction as a single course of conduct that included both the threats and the attempted murder; because the attempted murder resulted in a sentence of imprisonment, the court applied section 5G1.3(b) rather than 5G1.3(c).

But whether section 5G1.3(b) or 5G1.3(c) applied, the court was within its authority to run the sentences consecutively rather than concurrently. Of course, section 5G1.3(c) expressly authorizes consecutive sentences, and if the court had relied on that provision, we would generally presume a within-guidelines consecutive sentence to be reasonable. *Rita v. United States*, 551 U.S. 338, 347 (2007) (sentences that are within the properly calculated guidelines range are entitled to a rebuttable presumption of reasonableness); *United States v. Fletcher*, 763 F.3d 711, 715 (7th Cir. 2014); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). But courts are also free to

disagree with a guidelines recommendation, as the court did here when it rejected concurrent sentences under section 5G1.3(b). *See Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007). *See also Spears v. United States*, 555 U.S. 261, 265–66 (2009) ("we now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines.").

Moreover, a court is authorized by statute to impose a consecutive sentence when a defendant is already serving an undischarged term of imprisonment, as happened here. 18 U.S.C. § 3584(a). In determining whether the terms imposed are to be ordered to run concurrently or consecutively, the court "shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)." 18 U.S.C. § 3584(b).

And that is what the district court did in this instance. The court considered the section 3553(a) factors and applied them in determining where in the guidelines range to place Moore's sentence and also in deciding whether to run the sentence concurrent with or consecutive to the state court sentence. In particular, the court considered the nature and circumstances of the offense and the history and characteristics of the defendant. The court noted that the crime involved an armed robbery of a driver of a truck containing an interstate shipment of parcels, as well as threats to a potential witness and an attempt on the life of that witness. The court characterized the offense as "serious" and "quite a dangerous crime" which had a significant adverse impact on commerce. The court was also cognizant of the effect of the crime on the UPS driver, who was terrorized by the "quite harrowing" hijacking and who, along

with his family, suffered long-lasting consequences from Moore's acts.

In considering Moore's character and history, the court noted that, after committing this crime, Moore expressed interest in hijacking other trucks, that he had committed a prior crime of violence (a residential burglary), as well as misdemeanor battery, violation of an order of protection, and possession with intent to deliver a controlled substance. The court remarked, "The Sentencing Commission doesn't consider Mr. Moore a career criminal but I do. Public is not safe at all with Mr. Moore walking the streets as far as I'm concerned." Sent. Tr. at 28. In summarizing his reasons for a sentence at the high end of the guidelines and for a consecutive sentence, the court said:

> In light of the dangerousness of this crime, fear of death he imposed upon the driver during this offense, the multiple victims whose packages were stolen, the adverse effect on commerce, the adverse effect on the driver and his family after the offense, which continues to linger and will continue to linger, the clear inference that the defendant planned more robberies from which you can infer there would have been similar adverse effects. In light of the defendant's repeated criminal convictions, including the residential burglary crime of violence, his attempt to murder a witness in this case.

> When we look at the factors of need for the sentence imposed to reflect the seriousness of the offense,

> promote respect for the law, provide just punishment for the offense, protect the public from further crimes, and provide adequate deterrence, the Court will sentence the defendant … to the upper end of the guideline range of 235 months.

Sent. Tr. at 28-29. In deciding to run the federal sentence consecutive to the state sentence, the court again cited these same facts and expounded on the reasons for a lengthy sentence:

> But the Court finds that the obstruction enhancement, though technically correct—and I think, quite frankly, it's a close call. I'm not entirely confident in my ruling in that regard to be an insufficient remedy for shooting and trying to kill a witness in this case. As the facts bear out, [Moore] first threatened the witness, which would have been sufficient for the obstruction enhancement alone, but then actually to [attempt to] kill the witness takes these actions to [an] entirely different level. So the Court rejects the advice of the Commission on the point of concurrence versus consecutive treatment of this sentence to the state sentence for attempt murder. In addition, he was likewise convicted of a completely unrelated drug charge.

> As I alluded to earlier, Mr. Moore is a career criminal in my mind. These crimes deserve to be treated separately in the Court's eyes and the public deserves protection accordingly. For the reasons I outlined for justifying an upper end guideline

> sentence, I also, for the reasons just verbalized, find that the sentence herein shall run consecutive to the two state sentences the defendant's now serving for attempt murder and possession with the intent to deliver.

Sent. Tr. at 29-30.

The court extensively justified a sentence at the high end of the guidelines range and the consecutive treatment of that sentence. "Although the extent of the difference between a particular sentence and the recommended guidelines range is relevant, we afford deference to the district court's judgment whether a sentence is 'inside, just outside, or significantly outside' the guidelines range." *United States v. Tockes*, 530 F.3d 628, 632 (7th Cir. 2008) (quoting *Gall*, 552 U.S. at 41). A district court "must give serious consideration to the extent of any departure" from the guidelines and must explain its conclusion "that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 552 U.S. at 46. "The Supreme Court has rejected an appellate rule that requires extraordinary circumstances to justify a sentence outside the guidelines range, and also has rejected a rigid mathematical approach that compares the percentage of the departure with the strength of the justification." *Tockes*, 530 F.3d at 632; *Gall*, 552 U.S. at 46-47. The court must consider all of the section 3553(a) factors, making "an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49-50; *Tockes*, 530 F.3d at 632; *United States v. Miranda*, 505 F.3d 785, 791 (7th Cir. 2007).

It is pellucid that the court met that standard here. This was a quintessential exercise of judicial discretion. The district court heard the harrowing testimony of the UPS driver and reviewed the driver's victim impact statement, which addressed the long-term effects of the crime on the driver and his family. The court also heard the testimony of J.B., and reviewed her state court testimony regarding Moore's attempt on her life. The court also considered evidence presented in mitigation and the defendant's own statement. The court clearly determined that the obstruction enhancement could have been justified by the threats alone, that a two-level enhancement was inadequate to account for the very serious attempted murder of a witness, and that the two crimes were each so serious in their own right that only consecutive sentences would be appropriate. Contrary to Moore's contention, there was no duplication of punishment here. The court more than adequately justified its decision to reject the advice of the Sentencing Commission, and the sentence is therefore

AFFIRMED.