In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 13-3205

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN LAWRENCE,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-CR-396 — **Ronald A. Guzmán**, *Judge.*

---

ARGUED NOVEMBER 10, 2014 — DECIDED JUNE 2, 2015

---

Before WOOD, *Chief Judge,* and ROVNER and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* As part of a routine parole compliance check, state parole agents searched convicted felon Brian Lawrence's residence and found cocaine and ammunition. A jury acquitted him of the ammunition charge, but convicted him of possession with intent to distribute cocaine. Lawrence appeals, arguing that the government failed to prove him guilty beyond a reasonable doubt, that the district

court improperly denied his motion *in limine* to preclude dog-sniff evidence and his motion for a mistrial, that the jury instructions were misleading and finally, that his sentence was unreasonable. We affirm on all grounds.

**I.**

In addition to regular parole visits, Illinois Department of Corrections parole agents also occasionally conduct parole compliance checks during which they arrive unannounced and search a parolee's residence. On October 22, 2010, parole agents along with Chicago Police Department officers paid such an unannounced visit to Lawrence's residence at 6:40 a.m. Parole agents Louis Hopkins and James Hollenbeck knocked on the front door while another parole agent and two police officers, including Officer Lawrence Kerr, remained outside along the perimeter of the house. Lawrence's fiancée, Phyllis Williams, opened the door. Agent Hopkins told Williams that they were performing a parole compliance check and were looking for Lawrence. Williams motioned them toward a first-floor bedroom. As the agents walked past the door, Agent Hopkins looked up the stairway and saw Lawrence in his underwear and a t-shirt, standing at the top of the stairs and beginning his descent down. Lawrence informed the officers that his bedroom was on the first floor and pointed to the same bedroom that his fiancée, Williams, had previously identified. The agents, after handcuffing Lawrence for their safety, decided to survey the second-floor area from where Lawrence came. They ascended the stairs to a dimly lit hallway, where, while shining their flashlights, they found a drawer on the floor in the middle of the hallway. Agent Hollenbeck took a photograph of the drawer exactly as he found it at the moment of dis-

covery and the photo showed a plastic box, a box of sandwich bags, numerous other bags containing a white powdery substance, and an amount of currency, later determined to be $1,564. The parties stipulated that the white substance was 492 grams of a mixture containing cocaine.

Police officers then took over the investigation, photographing the drawer and taking the defendant and the drawer downstairs. Although the agents only had authorization to search areas of the residence under Lawrence's control, they, along with the police officers, secured the rest of the second floor for their safety.[1] Officers knocked on the remaining bedroom doors and found only sleeping or recently awakened and cooperative residents. They did not find any additional contraband, nor did they observe any furniture with a missing drawer.

In the bedroom that both Lawrence and his fiancée had identified as Lawrence's bedroom, officers found a dark-colored nightstand missing a drawer. The color and trim of the drawer found in the hallway matched the nightstand and the drawer was the proper fit for the empty space in the nightstand. Agent Hopkins also noticed a dusting of white powder on top of the nightstand.

---

[1] Upon his release from prison on parole for first degree murder, Lawrence signed a Parole Compliance Agreement. Under the terms of that agreement, Lawrence consented to the search of his person, property, and residence during the applicable time period. (Tr. 7/18/12, 9:30 a.m., p.56.) (D. Ct. R. 99, p.33) (App. R. 9-2, p.166). In executing a search, officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search. *Los Angeles County, v. Rettel*, 550 U.S. 609, 614 (2007).

Inside the remaining part of the nightstand, officers found multiple pieces of mail with Lawrence's name on them. Under the bed, the officers found a cardboard box with papers, including checks for an account with the name "Lawrence Construction," some other correspondence with Lawrence's name, and a shoebox, inside of which they found a small box of ammunition. Williams testified that the shoebox belonged to her and contained bullets she had taken from her son.

Upon searching the closet, officers discovered clothing and shoes that fit Lawrence and a locked safe. Officers asked Lawrence how they could open the safe, but Lawrence initially denied having a combination or key to the safe. Agent Hopkins testified that eventually Lawrence agreed to disclose the location of the key if Hopkins would agree to give "two stacks" to his "old girl." Agent Hopkins interpreted this as a request that he give $2,000 of the amount in the safe to Lawrence's fiancée, Phyllis Williams. Lawrence subsequently told Agent Hopkins that he could find the key in his bedroom closet in the pocket of a white shirt with beige stripes, which is precisely where Hopkins found it. Inside the safe, agents and officers found a large sum of money and a purple Crown Royal Whiskey bag containing more money, the total of which was later determined to be $14,364.

Officer Kerr testified that he kept the $14,364 recovered from the safe isolated from the $1,564 recovered from the drawer as the latter had clearly been contaminated with drug-related chemicals from its proximity to scales and cocaine. In later controlled testing, a certified drug-detecting dog, Achilles, alerted to the scent of drugs on both envelopes of currency.

As for other evidence presented at trial, an expert fingerprint examiner was unable to find any usable fingerprints on the ammunition, razor blades, cocaine packaging, or the outside of the cocaine-dusted scale. He did find three latent fingerprints inside the battery cover of the scale, but they did not belong to Lawrence, his fiancée, or anyone else in the house.

The jury found Lawrence not guilty of count one—knowingly possessing ammunition that had traveled in interstate commerce after having been previously convicted of a crime punishable by one year (18 U.S.C. §§ 922(g)(2) and 924 (e)(1)), and guilty on count two—knowingly possessing with intent to distribute cocaine. (21 U.S.C. § 841(a)(1)). The district court sentenced Lawrence to the lowest sentence recommended by the United States Sentencing Guidelines, 262 months' imprisonment.

## II.

### A.

Lawrence appeals five distinct issues, arguing first that the jury verdict should be overturned because the government failed to prove Lawrence guilty beyond a reasonable doubt. When asked to overturn a jury verdict, we must view the evidence in the light most favorable to the prosecution, and reverse only if the record is devoid of any evidence from which any rational jury could find guilt. *U.S. v. Pereira*, 783 F.3d 700, 703 (7th Cir. 2015); *U.S. v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015). This is a momentous task and has been described as anything from "extremely difficult" to "a nearly insurmountable hurdle." *See, e.g.*, *Miller*, 782 F.3d at 797; *U.S. v. Parker*, 716 F.3d 999, 1007 (7th Cir.) *cert. denied*, 134 S.

Ct. 532 (2013). Under this standard, we neither weigh evidence nor assess the credibility of witnesses, as those tasks are for the trier of fact. *U.S. v. Sewell*, 780 F.3d 839, 847 (7th Cir. 2015).

Lawrence argues that the jury had insufficient evidence to find that he possessed the crack cocaine. We conclude, however, that the jury had more than sufficient evidence before it to conclude just that. Lawrence presents a number of instances of conflicting evidence in his recitation of the facts. For example, he points to the fact that one agent thought Phyllis Williams took several minutes to open the door, while another agent testified that he did not think it took a suspiciously long time. One agent testified that Williams pointed to a bathroom when asked where Lawrence could be found; another agent testified that she pointed to a bedroom. One agent testified that Lawrence was walking down the stairs when he first saw him; the other agent reported that they met him at the base of the stairs. None of these discrepancies is significant (and most are not discrepancies at all, but rather a matter of viewpoint). As we just discussed, when reviewing a decision for sufficiency of the evidence we must view all of the evidence in the light most favorable to the government. *U.S. v. Yu Tian Li*, 615 F.3d 752, 755 (7th Cir. 2010). But even if we were to consider the varying accounts, none of it conflicts with the verdict in any significant manner, and certainly not in a manner that would cause us to conclude that no rational jury could have made the finding that it did.[2]

---

[2] The only materially conflicting testimony came from Lawrence's fiancée Williams who testified that another resident of the house, Reginald Camphor, spontaneously announced to the police that the drugs and

Because Lawrence was not caught actually holding or carrying the drugs, this case is one in which the government had to prove constructive possession. Constructive possession is a legal fiction in which a person is deemed to possess contraband even without immediate physical control of the object. *U.S. v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). To prove constructive possession, the government must establish that the defendant knowingly had both the power and intention to exercise dominion and control over the object, either directly or through others. *Id.* at 695. Not only can possession be actual or constructive it can also be exclusive or joint. *U.S. v. Gilbert*, 391 F.3d 882, 886 (7th Cir. 2004). Lawrence and his fiancée, therefore, could have jointly possessed the contraband found in their bedroom. All forms of possession can be proved by direct or circumstantial evidence. *Id.* at 886.

In constructive possession cases the government can demonstrate the required nexus between the defendant and the contraband by showing either exclusive control or a substantial connection to the contraband. *Griffin*, 684 F.3d at 695. If a defendant lives alone in an apartment and a search reveals contraband, proving constructive possession is relatively easy. When a defendant shares living space with others, the proof requires a more exacting approach because a court must be careful to separate true possessors from mere bystanders. *Id.* Proximity to contraband or pres-

---

money were his. (Tr. 7/19/12 9:55 a.m., p.364-65) (D. Ct. R. 100, p.829-30) (App. R. 9-2, p.474-75). The jury, who heard all of the evidence, was entitled to discredit the hearsay testimony of Camphor as reported through the defendant's fiancée.

ence on the property or association with a person in actual possession is not enough. *Id.* at 696.

This court has recently clarified how we ought to determine the substantial connection question in cases where the defendant shares a residence with others. In such an instance, the government must demonstrate a substantial connection between the defendant and the contraband. *Griffin*, 684 F.3d at 697. Lawrence, however, would like this court to go further. He argues that the government must show some unequivocal conduct on the part of the defendant connecting him to the drugs. But this is not what our case law requires. *Griffin* exhaustively examined this circuit's law on constructive possession in jointly occupied properties and boiled it down as follows: "[w]hen a defendant jointly occupies a residence, proof of constructive possession of contraband in the residence requires the government to demonstrate a 'substantial connection' between the defendant and the contraband itself, not just the residence." *Griffin*, 684 F.3d at 697. One way to establish such a connection is by demonstrating some conduct that links the individual to the illegal items, but that is not the only way. *Id.* at 696, 698; *U.S. v. Morris*, 576 F.3d 661, 668 (7th Cir. 2009).

In this case, the government had plenty of evidence from which a jury could connect Lawrence to the drugs even if he shared the residence with many people and shared his bedroom with his fiancée. When the agents knocked on the residence door, it took the defendant's fiancée a longer-than-

usual amount of time to open the door.[3] The defendant was standing at the top of the stairs in his underwear just a few feet from the drawer full of cocaine, drug paraphernalia, and a large amount of cash. The agent testified that Lawrence looked surprised and shocked to see him. Of course, Lawrence would have known that the agents could only search the room under his control, as that had been explicitly written into his parole agreement. The evidence painted a picture for the jury of a parolee startled awake by agents at his door, purposefully rushing to move contraband to another area of the house that he believed was outside of his control.

Both Lawrence and his fiancée separately identified a bedroom on the first floor as the one they shared. Inside the room agents and officers found a nightstand adjacent to Lawrence's bed that exactly matched the drawer they had seen earlier at the top of the stairs, and that was itself missing a drawer. The nightstand contained multiple pieces of mail addressed to Lawrence and bank checks from an account for "Lawrence Construction." The room also contained clothes and shoes that fit the defendant and a locked safe. Lawrence was able to identify the exact location of the key that opened that safe.

---

[3] This is an example of a fact in which the jury could consider the credibility of various witnesses. Agent Hopkins testified that it took Lawrence's fiancée, Phyllis Williams, several minutes to answer the door. Agent Hollenbeck testified that it did not seem like a long or suspicious amount of time had passed before Williams opened the door. These facts are not necessarily competing, but rather subjective interpretations of the events. The jury was entitled to give credence to either description and upon review of the sufficiency of the evidence, we consider the facts in the light most favorable to the jury verdict. *Li*, 615 F.3d at 755.

These facts easily fall into line with others in which we have determined that a defendant had constructive possession of contraband found in a shared residence. *See U.S. v. Reed*, 744 F.3d 519, 526 -27 (7th Cir.) *cert. denied*, 135 S. Ct. 130 (2014) (finding sufficient evidence of possession where drugs were found in the nightstand in the master bedroom in a residence shared by several others, where mail with the defendant's name was also found in the nightstand, and where the drugs were in close proximity to other personal effects like shoes and appointment cards belonging to the defendant); *U.S. v. Jones*, 763 F.3d 777, 799-800 (7th Cir.), *vacated, in part, on other grounds*, 774 F.3d. 1104 (7th Cir. 2014) *cert. denied*, No. 14-9190, 2015 WL 1539028 (2015) (finding sufficient evidence to support a jury finding of constructive possession where the defendant's cell phone and car were located at a residence the day of and five days before a raid that uncovered crack cocaine in common areas of the house); *U.S. v. Alanis*, 265 F.3d 576, 592 (7th Cir. 2001) (finding sufficient evidence for a jury determination of constructive possession of a gun in a shared bedroom where the police found the gun in a nightstand next to the defendant's bed, with his eyeglasses, clothing, and wallet nearby); *U.S. v. Richardson*, 208 F.3d 626, 628, 632 (7th Cir. 2000) (finding sufficient evidence for jury determination of constructive possession of a gun where the gun was on a bed along with envelopes addressed to the defendant and prescription medications with his name and the same address on the labels); *U.S. v. Kitchen*, 57 F.3d 516, 519-21 (7th Cir. 1995) (finding sufficient evidence for a jury determination of constructive possession in a shared residence where the police found papers and invoices with the defendant's name next to the gun, along with a gold bracelet with his nickname and clothing in his size).

There was also sufficient evidence that Lawrence trafficked in cocaine. An expert witness in narcotics trafficking testified that the quantity of narcotics far exceeded any amount one might have for personal use. He concluded that the 492 grams of cocaine found in the drawer would allow approximately 49,000 people to get high, and he estimated the street value at $40,000 to $100,000. He also described how the razor blades, scales, and plastic bags found in the drawer are all typical tools used to prepare cocaine for distribution. Finally, the expert testified that large amounts of cash, like that found in the drawer and safe are associated with drug trafficking, as drug sales generate large amounts of cash and because suppliers need large amounts to resupply their stock. The locked safe in the bedroom contained 14,364 drug-contaminated dollars and the drawer contained another $1,564.

Lawrence argues that the absence of fingerprints on the drug evidence indicates that no rational juror could conclude that he possessed the drugs. The fingerprint examiner, however, testified that there are many reasons why useful fingerprints might not be left on an object.

Lawrence appears to confuse circumstantial evidence with speculation. "A verdict may be rational even if it relies solely on circumstantial evidence. The question we must answer is whether each link in the chain of inferences the jury constructed is sufficiently strong to avoid a lapse into speculation." *U.S. v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) (internal citations omitted). As we describe above, the links in the chain were all sufficiently strong.

In sum, the amount of evidence of Lawrence's guilt was overwhelming and was undoubtedly sufficient to support a reasonable jury determination of guilt.

**B.**

Lawrence argues next that the district court erred by denying his motion *in limine* to exclude evidence obtained by the drug-detecting dog. We review a district court's decision to admit evidence for an abuse of discretion. *Common v. City of Chicago*, 661 F.3d 940, 943 (7th Cir. 2011).

As part of its case, the government presented evidence that the money discovered in the safe, as well as the money found in the nightstand drawer, had been tainted by drug residue—a sign that the money had been part and parcel of the drug trade. The government elicited lengthy testimony about how the money from the safe had been vigilantly segregated from other contaminated material, and that a highly trained and skilled drug-detecting dog had alerted to the scent of drugs on the currency after it had been hidden in a carefully controlled environment. The government's presentation included detailed descriptions of its double blind methodology; controlled testing on freshly minted currency; and the dog's testing, training, and qualifications.

We need not detail all of that methodology here, as Lawrence does not argue that the dog was unqualified or that the circumstances surrounding the alert were uncontrolled or faulty. Instead, he argues that the whole of this genre of evidence is meaningless—that such a high percentage of U.S. currency is tainted with drugs that evidence of tainted currency provides no indication of when or how the cash became contaminated. Indeed, this was an argument

that was well-accepted by this court and many others throughout the 1990's. The defendant cites our opinion in *U.S. v. $506,231*, 125 F.3d 442, 453 (7th Cir. 1997), as well as cases from several other jurisdictions for the proposition that a drug alert on currency is meaningless. Our position in the *$506,231* case was a bit more nuanced than the defendant describes but, in any event, in 2005 this court, after reviewing the empirical and scientific evidence on contamination, changed course:

> Given the apparently rigorous empirical testing giving rise to this conclusion, it is likely that trained cocaine detection dogs will alert to currency only if it has been exposed to large amounts of illicit cocaine within the very recent past. As a result … it seems that a properly trained dog's alert to currency should be entitled to probative weight.

*U.S. v. $30,670*, 403 F.3d 448, 459 (7th Cir. 2005). This is not to say that a defendant could not attempt to present his own evidence of contaminated currency today. *See, e.g., U.S. v. $100,120.00*, 730 F.3d 711, 719-20 (7th Cir. 2013). But Lawrence did not do so. Instead he argues, without any reference to our more recent cases, that there is a per se rule that dog alerts to drug-contaminated currency are unreliable. Our current case law does not so hold. *$30,670*, 403 F.3d at 459.

The government presented ample evidence of the training, controlled testing, certification, and reliability of the drug-detecting dog in this case. This was more than sufficient to support the district court's finding that the results of the controlled canine drug-detection test offered probative value to the case and could be considered by a jury as evi-

dence that the currency found in the drawer and in the safe had been in recent contact with drugs.

## C.

Among the uphill routes Lawrence plods is the one in which he asks this court to overturn the district court's denial of a mistrial. We review a denial of a mistrial for an abuse of discretion with an extra helping of deference. *U.S. v. Vargas,* 689 F.3d 867, 873 (7th Cir. 2012). The district court, after all, "is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial." *Id. citing U.S. v. Clarke,* 227 F.3d 874, 881 (7th Cir. 2000). We, therefore, "must affirm unless we have a strong conviction that the district court erred," and the error committed was not harmless. *Id.* The ultimate inquiry is whether the defendant was deprived of a fair trial. *Id. citing Clarke,* 227 F.3d at 881.

In this case, it is undisputed that an error occurred at trial. Agent Hopkins testified that after Lawrence first denied having access to the safe, he later offered to tell Hopkins where the key was if Hopkins would give "two stacks" ($2,000) to his "old girl" (Lawrence's fiancée, Williams). Defense counsel objected to the admission of this statement. In a side bar conference, Lawrence's counsel stated that although he did not object to the statement about the location of the key, he believed that the government had not tendered the statement about the "two stacks," as required by Rule 16(a)(1) of the Federal Rules of Criminal Procedure. Rule 16(a)(1) requires the government, upon the defendant's request, to disclose to the defendant the substance of any relevant oral statement made by the defendant, before or af-

ter arrest, if the government intends to use the statement at trial. Fed. R. Crim. P. 16(a)(1).

At the time of the side bar, the government lawyer thought that he had previously discussed the statement with Lawrence's counsel and reported that he believed the conversation had been memorialized in a letter. After checking during the lunch break, however, the government reported back that it had not adequately memorialized the statement in its letter to defense counsel. The defendant moved for a mistrial.

After hearing the defendant's arguments about the prejudice and the government's reply, the district court denied the motion for a mistrial and instead, while Agent Hopkins was still on the stand, instructed the jury that the "testimony to the effect that the defendant requested from the parole agent that the parole agent give his girl Phyllis Williams two stacks or $2000 in exchange for information as to where the key to the safe was" had been improperly admitted and was stricken from the record. (Tr. 7/18/12 9:30 a.m., p.115) (App. R. 9-2, p.225) (D. Ct. R. 99, p.92). The district court instructed the jury to disregard it "in every respect." *Id.* Lawrence argues however that the error was so great that it "overpowered the district court's instruction to the jury to disregard Agent Hopkins' testimony," (Lawrence Brief at 28), and the district court abused its discretion in refusing to grant a mistrial.

A new trial is "warranted only when all other, less drastic remedies are inadequate." *U.S. v. Warren*, 454 F.3d 752, 760 (7th Cir. 2006), and absent a showing of abuse of discretion and prejudice, the trial court is well within its rights to fashion a remedy for the government's noncompliance with

Rule 16. *See id.* A new trial is appropriate only if the alleged Rule 16 violation deprived Lawrence of a fair trial. *Id.*

Our robust deference in this instance is warranted because district court judges are in the best position to evaluate the effect that an error may have on the overall course of the proceedings. *U.S. v. Curry*, 538 F.3d 718, 728 (7th Cir. 2008). Consequently, district court judges have broad discretion in deciding to give a cautionary instruction rather than to declare a mistrial. *Id.* Our case law requires us to assume that juries follow the corrective instructions they are given. *U.S. v. Wilson*, 237 F.3d 827, 835 (7th Cir. 2001).

Curative instructions, although not perfect (*see Maus v. Baker*, 747 F.3d 926, 927-28 (7th Cir. 2014)), can alleviate prejudice. And they have long been accepted in this circuit as a reasonable use of a district court's discretion to avoid a mistrial. *See, e.g., Jones,* 763 at 809; *U.S. v. Adkins*, 743 F.3d 176, 186 (7th Cir.), *cert. denied,* 134 S.Ct. 2864 (2014); *Curry,* 538 F. 3d at 728. Thus the defendant's citations to cases from half a century ago and other circuits do not offer us much guidance.

The government's position—that it disclosed the statement in a pre-trial discussion, despite not having written confirmation to prove it—raises questions about whether there was any prejudice at all. In any event, even if the government had not disclosed the statement in any way, the district court did not abuse its discretion by failing to grant a mistrial. The district court issued a curative instruction after a short recess and while Agent Hopkins was still on the stand and the testimony was still fresh in the jurors' minds. *See U.S. v. Marr*, 760 F.3d 733, 742 (7th Cir. 2014). The district court judge also instructed the jurors at the start and end of

trial not to consider any evidence that the court excluded or told them to disregard.

Admittedly, the comment demonstrated Lawrence's control and ownership of the money in the safe. But the fact that Lawrence knew the exact location of the hidden key was just as demonstrative of his control as was the comment about the "two stacks" and the latter added little, if anything. Defense counsel also claims that Lawrence would be prejudiced by the introduction of an attempt to blackmail a parole agent. As the government points out, however, this was not blackmail in any traditional sense. Agent Hopkins did not testify that the defendant offered to pay the agent any money or that Lawrence threatened Hopkins in any way in order to obtain the money for himself. Instead, the agent testified that Lawrence offered to disclose the location of the key if the agent gave Lawrence's fiancée some of the money. Certainly a reasonable jury could have viewed this as an endearing altruistic effort to help out his fiancée, rather than as an act of blackmail. But even if a jury might view it negatively (and we agree that many juries might), the district court did not abuse its discretion by determining that a curative instruction would rectify any potential prejudice.

**D.**

In his fourth issue on appeal, Lawrence argues that the district court erred by allowing a non-pattern jury instruction on possession. We review de novo whether a challenged jury instruction fairly and accurately summarized the law, but the trial court's decision to give a particular instruction is reviewed for an abuse of discretion. *Hawkins v. Mitchell*, 756 F.3d 983, 998 (7th Cir. 2014). We will reverse only if the in-

structions, taken as a whole, misled the jury. *U.S. v. Curtis*, 781 F.3d 904, 907 (7th Cir. 2015).

Lawrence objects to the non-pattern "possession" instruction without explaining to this court what particular portion of the instruction he objects to and why. In fact, nowhere in his brief does he even direct this court to a record cite of the jury instruction to which he objects. Nor does he explain his specific objection, other than to say that the explanation of the term "possession" was "overly broad," and unnecessary. (Lawrence Brief at 30). [4]

> The instruction given to the jury was as follows:
>
> Possession of an object is the ability to control it. Possession may exist even when a person is

---

[4] The fact section of Lawrence's brief (p.15) cites to some transcript pages about the jury instruction conference, but without any reference to the jury instructions themselves, or the particular portion of them to which Lawrence objects. Moreover, the defendant cites transcript pages 400, 402, 404, etc. In this particular case, transcripts were submitted at two different points in the appellate court record, occur over the course of 11 dates, and were not sequentially numbered originally. Each date was assigned a separate record number by the district court. It is difficult, therefore, for this court to find a particular transcript page without reference to a date or at least to a record number in the district court or this court. In short, there are many different possible locations for a page 404 in the record. After a time-consuming search, we were able to track down the jury instruction discussion at Tr. 7/19/12, pp.404-434; (D. Ct. R. 100, pp.168-198) (App. Ct. R. 9-2, p.514-544). To make our cites explicitly clear, we have cited to a transcript date and page number, the district court record number and page number, and the appellate court record number and page number. Although such a duplicative system of citation might not always be required, we urge litigants before this court to use a system of record citation that is unambiguous and directs this court to the appropriate place in the record in the clearest manner possible.

> not in physical contact with the object, but knowingly has the power and intention to exercise direction and control over it, either directly or through others.
>
> Also, an individual may possess an object if other individuals share the ability to exercise control over the object. Possession may be either sole or joint. If one person alone has possession of an object, possession is sole. If two or more persons share possession of an object, possession is joint. If you find beyond a reasonable doubt that the defendant knowingly possessed the object in question, either alone or jointly with others, you should find that the defendant possessed the object.
>
> A person can possess an object without owning the object, provided that the person has the power and intention to control the object.

(D. Ct. R. 61, p.15) (App. R. 5-3, p.94).

Because we do not know to what the defendant objects, we assume, as the government did, that he objected in general to the instruction on joint possession. The district court found that an instruction on joint possession was essential:

> [g]iven the testimony, especially the testimony of the defense witnesses, it's important to instruct the jury that more than one person can possess an object. It is possible for the jury to draw the inference that both the defendant and Ms. Williams possessed the bullets from the testimony given. A rational person could draw

> that inference, depending on what portions of
> the testimony of the government witnesses and
> Ms. Williams they believed.

(Tr. 7/19/12, 1:20 p.m., p.412) (D. Ct. R. 100, p.176) (App. R. 9-2, p.522). Although the district court spoke here of the bullets that were found under the bed that Lawrence shared with his fiancée, it applies equally to both the drug and money evidence. The district court was correct in assuming that an instruction on joint possession was necessary.

The jury instruction was not only necessary and did not mislead the jury, but it set forth a correct explanation of the law on joint possession in which possession may either be sole or joint. *Jones*, 763 F.3d at 800; *U.S. v. Villasenor*, 664 F.3d 673, 681 (7th Cir. 2011). In fact, in the face of a comparable challenge, this court has upheld a similar instruction that stated:

> Possession may be sole or joint. If one person
> alone has actual or constructive possession of a
> firearm, possession is sole. If two or more per-
> sons share actual constructive possession of a
> firearm, possession is joint. An individual may
> possess a firearm even if other individuals may
> have access to a location where possession is
> alleged. Also, an individual may possess a fire-
> arm even if other individuals share the ability
> to exercise control over the firearm. Possession
> may be joint.

*U.S. v. Thornton*, 463 F.3d 693, 696 (7th Cir. 2006). *See also*, *U.S. v. Aldaco*, 201 F.3d 979, 989-90 (7th Cir. 2000); *U.S. v. Tirrell* 120 F.3d 670, 675-76 (7th Cir. 1997). In the face of

Thornton's objection that the instruction was too broad, a panel of this court held that the instruction accurately stated the law on joint possession. *Thornton*, 463 F.3d at 699.

We find that the district court did not abuse its discretion by giving the supplemental jury instruction, that it was a correct summary of applicable law, and did not mislead the jury.

**E.**

Our final deferential review is of Lawrence's sentence which, because it was within the Guidelines, we presume to be reasonable. *U.S. v. Moore*, No. 14-3269, 2015 WL 1874216, at *5 (7th Cir., Apr. 24, 2015). The defendant does not contest the Guidelines calculation in this case, nor does he argue that the district court judge failed to apply the individual factors specified in § 3553 as required. *See U.S. v. Lua-Guizar*, 656 F.3d 563, 566 (7th Cir. 2011). The district court correctly calculated Lawrence's Guidelines calculation as 262-327 months and sentenced him at the lowest end of that range. Lawrence requested that the district court judge use his discretion to disregard the career offender enhancement and sentence him in the range of 92-115 months.

Lawrence's counsel argues that even a sentence at the very lowest end of the Guidelines range was excessive. He argues that the offense of conviction was non-violent, Lawrence had less than a half kilogram of cocaine, he had obtained his GED and had a work history, had the support of his family members and friends, and that the bulk of his crimes had occurred when he was much younger.

Our review of sentencing decisions generally is limited to whether they are reasonable. *Moore*, 2015 WL 1874216 at

*3. The district court meticulously reviewed Lawrence's criminal history and even particularly noted that he was "aware of the draconian effect of career offender status and the possibility for an unjust determination if that statute is applied and followed in sentencing technically without regard for nuances and differences in the backgrounds and criminal histories of different defendants." (Tr. 8/22/13, p.9) (D. Ct. R.102, p.9) (App. R. 9-2, p.645). The district court then went on, however, to note Lawrence's disturbing criminal history. At the age of nineteen, he was convicted of aggravated battery with a firearm, armed violence, and four counts of aggravated battery for shooting another person. He served only two years of his six year sentence before being paroled. Then, four years later, he was convicted of first degree murder and, three days later, attempting to buy five kilograms of cocaine. He served only eight years of his twenty-year sentence for those crimes, and committed the offenses at issue in this case while on parole for the first degree murder conviction. The court concluded that he had spent the better part of his time since the age of 18 committing crimes of violence and dealing drugs.

The district court judge thoughtfully explained his reasoning for applying the career offender enhancement, noting that to ignore it would be unfair "to the public, the people that the defendant would be living with and in whose community he has been conducting crimes of violence and drugs since he was 18 years of age." (Tr. 8/22/13, p.11) (D. Ct. R.102, p.11) (App. R. 9-2, p.647):

> this defendant has been given three clear opportunities in his life to do right. He has been sentenced to increasingly heavy jail time in an

>attempt to deter him from future criminal conduct. He has been placed on parole in an attempt to help him rehabilitate. And none of that has worked. He has committed serious offenses. He has done so repeatedly. He has done so in spite of having been previously incarcerated.

*Id.* The Judge concluded by noting that he had considered the § 3553 factors, that he had prioritized the need to protect the community from drugs and violence and considered the possibility of rehabilitation. The district court exercised discretion reasonably and thoughtfully in refusing to ignore the career offender enhancement. *See, e.g., U.S. v. Jones,* 739 F.3d 364, 373-74 (7th Cir. 2014).

### III.

For the reasons articulated above we affirm the district court opinion in its entirety.

AFFIRMED