In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-3139

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARIO GIANNINI,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00551-3 — **Matthew F. Kennelly**, *Judge.*

———————————

ARGUED FEBRUARY 21, 2024 — DECIDED JUNE 18, 2024

———————————

Before EASTERBROOK, BRENNAN, and KIRSCH, *Circuit Judges.*

KIRSCH, *Circuit Judge.* After a five-day trial, a jury found Mario Giannini guilty of wire fraud and honest services fraud. Giannini appeals the denial of his motion for a mistrial based on the government's belated disclosure of investigating agents' notes regarding an inculpatory statement he made to Robert Czernek, a co-defendant. He also asserts that the court erred in allowing the prosecutors, in closing arguments, to

raise the conduct of another co-defendant, Debra Fazio, who was dismissed from the case following the government's case-in-chief after the court granted her motion for acquittal. Because the district court neither abused its discretion in denying the motion for a mistrial nor plainly erred in allowing the prosecutors to discuss Fazio's conduct, we affirm.

I

Mario Giannini and Robert Czernek engaged in a nearly-decade long series of schemes in Bloomingdale Township, Illinois involving fraudulent invoices and kickbacks. Czernek, the Highway Commissioner for the Township, was responsible for reviewing and approving invoices that the Township's contractors submitted for payment. Giannini worked for one of the contractors, Bulldog Earth Movers, which was solely owned by his longtime girlfriend, Debra Fazio.

In the first scheme, beginning in 2012, Giannini and Czernek agreed that Bulldog would artificially inflate its invoices for delivering stone and split the inflated amount between Czernek and Bulldog. In the second, around 2016, Giannini requested that Czernek assign to Bulldog work moving and leveling dirt at a dump site. Czernek would leave notes describing what work Bulldog should bill, and Giannini would give those notes to Fazio to prepare invoices that falsely increased the number of work hours Bulldog performed. Czernek approved the invoices, and Giannini kicked back some of the proceeds to Czernek. Finally, around 2019, Czernek and Giannini arranged for Bulldog to bill the Township for work repairing storm sewers that Bulldog never performed. Giannini kicked back some of the profits to Czernek, again using invoices prepared by Fazio based on Czernek's notes. Giannini paid Czernerk via checks made out to Tri-State Express,

a trucking company owned by Czernek that had been dissolved in 1998 and had not done any work after the mid-2000s.

Giannini, Czernek, and Fazio were indicted on fourteen counts of wire and honest services fraud in violation of 18 U.S.C. §§ 1343 and 1346, and Fazio was additionally charged with six counts of money laundering in violation of 18 U.S.C. § 1957(a). Czernek chose to cooperate with the government and pleaded guilty to wire and honest services fraud pursuant to a cooperation plea agreement. Giannini and Fazio proceeded to trial, but, following the government's case-in-chief, the district court granted Fazio's motion for acquittal on all counts under Federal Rule of Criminal Procedure 29.

In his trial testimony, Czernek described an inculpatory conversation he and Giannini had in November 2019: Giannini, in response to Czernek's noting that Giannini's toy truck collection appeared "expensive," stated, "[a]s long as we keep doing what we're doing, it will be okay." On cross-examination, among numerous other attempts at impugning Czernek's credibility, Giannini's counsel sought to show that Czernek had fabricated this statement for trial by asking him whether he had told any government agents about the conversation. Czernek replied that he had done so in a meeting with the government the day before his testimony.

The next day, the FBI agent present at that meeting, Matthew Blankenship, testified that Czernek had first made the statement in a meeting with an IRS agent over a week before his testimony. He also noted that he had erroneously failed to include the statement in the reports produced to Giannini, which described Czernek's meetings with the government. The district court ordered the government to produce the

notes of the meetings. The government complied, producing both agents' notes.

Giannini's counsel moved for a mistrial, arguing that the government's delayed disclosure violated Federal Rule of Criminal Procedure 16 and the Jencks Act, 18 U.S.C. § 3500. The district court denied the motion. It concluded that the notes should have been produced under Rule 16 and the Jencks Act but that a mistrial was not needed because the delayed production did not sufficiently prejudice Giannini. As a remedy, it barred the government from introducing the notes at trial to bolster Czernek's and Agent Blankenship's testimony and allowed Giannini to recall Blankenship to ask about the notes, but Giannini did not do so. Moreover, during his testimony, Giannini denied making the statement to Czernek, and the court believed his denial substantially diminished the prejudice from the delay.

The trial proceeded to closing arguments, during which the prosecutors made numerous references to Fazio and her conduct. Giannini did not object to those remarks. Some of the comments emphasized the greed of Fazio, Giannini, and Czernek as motivating the schemes. Others described Fazio's role as the sole owner of Bulldog, Bulldog's role in the schemes, and Fazio's involvement in the schemes through her creation of fraudulent invoices. After closing arguments, Giannini was found guilty on all counts.

II

A

On appeal, Giannini first argues that the district court erred in denying his motion for a mistrial. Giannini contends that the belated production of the agents' notes, which the

district court found violated Rule 16 and the Jencks Act, caused him sufficient prejudice to merit a mistrial because it impeded his ability to effectively cross-examine Czernek. He also contends that it bolstered Czernek's credibility and diminished both his and his counsel's credibility.

We review denial of a motion for mistrial for abuse of discretion and will affirm unless the error was not harmless—the prejudice from the violation must have deprived Giannini of a fair trial. *United States v. Lawrence*, 788 F.3d 234, 243–44 (7th Cir. 2015). We conduct this review "with an extra helping of deference" in consideration of the district court being best positioned "to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial." *Id.* at 243 (quotation omitted).

The district court found that the prejudice to Giannini from the belated disclosure (his pursuit of a fruitless line of cross-examination) was minimal, if not nonexistent, and thus could not justify granting a mistrial. It also noted that Giannini's denial that he made the statement further limited the prejudice from the delayed production. And it sought to cure any prejudice by barring the government from introducing the agents' notes.

We first address the Rule 16 issue, which the district court handled well. Rule 16 requires the government to disclose documents and papers within its "possession, custody, or control" that are material to preparing the defense or that the government intends to use in its case-in-chief at trial. If the government fails to comply with Rule 16, the court can order discovery or "enter any other order that is just under the circumstances." Fed R. Crim. P. 16(d)(2). This includes ordering a mistrial, but such a remedy is "appropriate only when all

other, less drastic remedies are inadequate." *United States v. Tomkins*, 782 F.3d 338, 348 (7th Cir. 2015) (cleaned up). At base, a mistrial is warranted "only if the alleged Rule 16 violation deprived [the defendant] of a fair trial." *Lawrence*, 788 F.3d at 244.

Assuming the government's delayed disclosure violated Rule 16, the district court did not abuse its discretion by denying Giannini's motion for a mistrial. The late disclosure resulted in little to no prejudice to Giannini, and the court's remedies were adequate to address any such prejudice.

Giannini may have been surprised by the late revelation of the notes, but he still had sufficient opportunity to prepare and present his defense. His strategy was to impeach Czernek by showing that he was not credible and that he fabricated the inculpatory statement for trial in order to earn his cooperation. This late disclosure had little impact on that strategy. Czernek admitted that he first revealed the statement to investigators only shortly before trial, so it still could have been fabricated, and insinuated that he made the statement to ensure he got cooperation credit. So while the late disclosure may have made this line of impeachment somewhat weaker, it did so only marginally because Giannini was able to leverage this statement, as well as a bevy of other examples, to suggest that Czernek was not credible. Simply, the belated disclosure did not prevent Giannini from impeaching Czernek and thus did not prejudice him. Cf. *United States v. Warren*, 454 F.3d 752, 760–61 (7th Cir. 2006) (finding no prejudice where the belated production of evidence did not prevent the defendant from using it in his defense).

The only other possible prejudice to Giannini was from Agent Blankenship's testimony that Czernek made the

statement to investigators over a week before his testimony, but this too was insufficient for a mistrial for two reasons. First, Giannini was still able to effectively cross-examine Agent Blankenship. Even after being confronted with the re-mark that Czernek made the statement at least a week before testifying, he was still able to suggest that: (1) there was no record of such a statement; and (2) Czernek was lying and had devised the statement for trial. He adduced testimony from Agent Blankenship that he had seen no reports containing Czernek's statement, that Czernek told agents of the state-ment only over a week before trial, and that Czernek had lied to investigators in the past. Second, the court's remedy of bar-ring the government from introducing the notes to corrobo-rate Agent Blankenship's testimony effectively limited any prejudice. While Giannini could imply there was no record of the statement, the government could not refute that position with evidence of such a record. And Giannini used this to his advantage in closing, asserting that the agents thought Czer-nek's statement was so insignificant that they did not even in-clude it in a report.

Giannini also urges that a mistrial was required under the Jencks Act. If the papers or documents in the government's possession contain statements of a witness called by the gov-ernment (so called Jencks material), the Jencks Act requires the government to produce those statements after the witness has testified on direct examination on motion of the defend-ant. 18 U.S.C. § 3500(b). If the government "elects not to com-ply" with an order mandating production of Jencks material the court "shall strike from the record the testimony of the witness" and can declare a mistrial if "the interests of justice require." *Id.* § 3500(d). But if the government has no "motive to suppress evidence," and "any prejudice resulting from the

tardy production of statements is curable at trial," the government has not "elect[ed] not to comply." *United States v. Wables*, 731 F.2d 440, 447 (7th Cir. 1984). Thus, a court can "use its discretion to fashion appropriate remedies." *Id.*

There was no election not to comply with any court order, so the court acted soundly in refusing to grant a mistrial. The record does not suggest that the government intentionally withheld these notes or otherwise had any motive to suppress them. It indicates, at most, that the government's conduct was a negligent oversight and an instance of poor record keeping. And the government's prompt disclosure of the materials upon discovering they were in its possession dispels any indication of bad faith. *Id.* ("[T]he government's diligence in gathering and producing all pretrial statements within twenty-four hours" of discovering a Jencks Act issue signified good faith.). Thus, there was no need to strike any testimony, let alone impose the drastic remedy of a mistrial. Additionally, as discussed, there was limited prejudice to Giannini from the belated disclosure, so any violation of the Jencks Act was harmless.

B

Giannini's second challenge on appeal is that the prosecutors' references to Fazio's acquitted conduct in closing arguments deprived him of a fair trial. Because he failed to object to these comments at trial, we review for plain error. *United States v. Chavez*, 12 F.4th 716, 728 (7th Cir. 2021). Even assuming error, we will not reverse unless Giannini "probably would have been acquitted if the prosecutor had not made" the challenged comments. *Id.* In other words, Giannini must "show that the outcome of the proceedings would have been different had the statements not been made." *United States v.*

*Guzman-Cordoba*, 988 F.3d 391, 406 (7th Cir. 2021) (quotation omitted). For these reasons, we have cautioned that "improper comments during closing arguments rarely constitute reversible error." *United States v. Klemis*, 859 F.3d 436, 442 (7th Cir. 2017) (quotation omitted).

We evaluate a claim of prosecutorial misconduct through improper statements at closing arguments in two steps. First, we determine if the comments were "improper standing alone." *United States v. Kelerchian*, 937 F.3d 895, 916 (7th Cir. 2019) (quotation omitted). Second, if they were improper, we then inquire "whether the remarks in the context of the whole record denied the defendants the right to a fair trial." *Id.*

We can resolve Giannini's claim at step one: the remarks regarding Fazio's acquitted conduct, even if they implied her guilt, were proper. This is a straightforward application of *United States v. Briseno*, 843 F.3d 264 (7th Cir. 2016). There, we focused on the relevance of the acquitted conduct described in the allegedly improper statements and noted that any argument that the statements were improper was erroneously premised on the idea that the acquitted conduct was irrelevant to the charge submitted to the jury. *Id.* at 269. Accordingly, we held that the references to a defendant's acquitted conduct in closing arguments were proper because the evidence was directly relevant to the charge the jury would consider. *Id.* at 270.

As in *Briseno*, the prosecutors' comments pertaining to Fazio's acquitted conduct were highly relevant to the charges against Giannini and thus were proper. Descriptions of what exactly Fazio did, her knowledge, her and Giannini's motivations, and the role she (and Bulldog) generally played in the schemes were key to establishing a full story. For example, in

describing how the schemes operated, the government articulated how Fazio wrote fraudulent invoices and, because of her greed, failed to question their propriety. If the government could not discuss this evidence, it would leave a conceptual void in its case. Given *Briseno*, where it was proper to comment on a defendant's acquitted conduct, it cannot be improper for the prosecutors to remark on this highly relevant evidence merely because it might have implied the guilt of Fazio—a former, acquitted defendant. 843 F.3d at 269–70.

Even if it was error to allow the comments, it was harmless because, had the prosecutors not referenced Fazio, Giannini would not have been acquitted in light of the overwhelming evidence against him, as well as the weakness of his defense. The government presented extensive testimonial and documentary evidence demonstrating Giannini's guilt. This included testimony from numerous persons such as Czernek and FBI agents, and documentary evidence—for instance, the invoices from Bulldog that over-billed for the work performed and photographs showing that storm sewer work Bulldog billed for had not been done. Giannini's defense was that the payments to Czernek were for work done by and equipment rentals to Tri-State, Czernek's trucking company. That defense was fruitless: Tri-State had not operated for nearly a decade by the time the first scheme began. Moreover, his testimony in support of the defense was not credible. For example, he stated that he had a business card from Tri-State but could not produce it, and he was unable to identify any equipment rented out or any records of such rentals. In sum, allowing the prosecutors to reference Fazio in closing arguments did not constitute error, much less reversible error.

AFFIRMED